# HAROLD B. RICHARDSON vs. STATE OF MARYLAND.

*Evidence — Identification of Persons — Contradicting and Impeaching Witness in a Criminal Case.*

Two witnesses in a criminal case testified that at a designated hour, upon a certain evening, they recognized the traverser as he passed under a street lamp about a hundred feet distant from the place where the witnesses were seated. *Held*, that this evidence may be impeached by the testimony of other witnesses of equally good eyesight, seated in the same place a few evenings afterwards, that under similar condttions of atmosphere, and at about the same hour of the evening they were unable to recognize persons of their acquaintance who passed under the same lamp.

When the prosecuting witness in a criminal case denies on cross-examination that he offered to pay a sum of money to a witness for the defence to induce him not to appear, or to another person to induce him to testify, he may be contradicted by evidence showing that he did make such offers.

Appeal from the Circuit Court for Washington County (STAKE, J.)

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, PAGE, BOYD, PEARCE and SCHMUCKER, JJ.

*M. L. Keedy* (with whom was *J. W. Wolfinger* on the brief), for the appellant.

The evidence offered in the first exception should have been admitted because it throws light upon the interest, bias, inclination and *animus* of the witness. His testimony as to the identity of the party who fired the shots was but his *judgment* or *opinion*. The jury had the right to know the partiality or impartiality of his judgment and anything which tended to show *partiality, bias, interest or inclination*, was relevant and proper to be submitted to them. *Wyeth* v. *Walzl*, 43 Md. 432; *Chelton* v. *The State*, 45 Md. 564; *Wh. Cr. Ev.*, secs. 748 and 749, and cases cited in note 6;

*Taylor on Ev.*, sec. 1442 ; *Atty.-Gen.* v. *Hitchcock*, 1 Exchequer, 91 ; *Tullis* v. *State*, 39 Ohio St. 200; *Moriarity* v. *London, &c., Railway Co.*, L. R. 5 Q. B. 314.

The second exception raises a different question. The object of the testimony proffered was to place before the jury the *opportunity* possessed by the witnesses Donaldson and Ferguson to identify the person whom they saw pass the lamp-post. It will be observed from the testimony that the traverser and Percy Embley *each* wore on Tuesday evening "a light hat, with dark band, and a dark coat." The traverser testified that *he* did not pass the lamp-post ; Embley testified that he, Embley, *did*. The witnesses, Donaldson and Ferguson, both testified, positively, that it was the traverser, and not Embley. Both the traverser and Embley were before the jury as witnesses, and their general striking similarity was apparent. We submit that it was proper and competent to place before the jury *every fact* which would have reasonably reflected upon the *opportunity* possessed by the witnesses for the State, Donaldson and Ferguson, to enable them to distinguish one from the other, or to enable them to identify the party who passed the lamp-post. Not only was the evidence of Donaldson and Ferguson flatly contradicted by the traverser and Embley ; but the testimony of Rudisill, Marshall Hoffman, Huber Rhinehart, Frank Crowther, Huber Koontz, and others was such as, practically, to render it impossible for the traverser to have been the person seen by Donaldson and Ferguson. Therefore, it was most material and important that the jury should have every *fact* to enable them properly to weigh the testimony thus in conflict. It was after night. It is admitted that the darkness of the night prevented identification ; but it was claimed by these witnesses, Donaldson and Ferguson, that the light from the street-lamp enabled them to do so. The question of the brilliancy of this light became a very material question. Its brilliancy could not be described to the jury in the abstract. It was only by bringing some object within the influence or scope of its

rays that any witness could make intelligible to the jury its
power, or brilliancy, or want of the same.   This we pro-
posed to do.   An examination of the proffer will show that
the test was a fair one ; that the conditions existing on the
evenings of May 27th and 28th were the same as those of
the evening of May 2nd ; that the evenings of May 27th
and 28th were clear evenings, so was the evening of May
2nd ; all three evenings were moonless ; that on the even-
ings of May 27th and 28th the street light was burning
with its usual and accustomed brilliancy ; that the environ-
ments on evenings of May 27th and 28th were the same as
on evening of May 2nd.   The time, 8.40, on evenings of
May 27th and 28th, about the same length of time after
sunset as 8.15 on evening of May 2nd.   The witness, Unger,
and the other witnesses, all young men, with good eye-
sight, at same place as witnesses Donaldson and Ferguson.
The two young men who went up the road for the purpose
of coming back, crossing railroad and by the lamp-post,
being well known to Unger and the others, bearing no re-
semblance to each other and coming down the road, past
Richardson's house, one at a time, crossing railroad, going
by lamp-post with face turned, and all, as Donaldson and
Ferguson saw party come and go.   We proposed to show
by this witness, Unger, as well as by three others, that the
light emanating from this street lamp was not of such a
character as to enable either one of them to identify a per-
son passing the lamp-post under the circumstances proposed,
and, thereby, to show to the jury that the evidence of the
witnesses for the State, Donaldson and Ferguson, was not
entitled to that weight which their positive language other-
wise would convey and impress upon the minds of the jury.

The opinion proffered *was based upon facts observed by
the witness*, and along with the facts upon which based, was
competent and admissible. *Harris on Law of Identification*,
sec. 180 ; *Yates* v. *People*, 32 N. Y. 509 ; *Cavendish* v. *Town
of Troy*, 41 Vt. 99 ; *Porter* v. *Pequonnoc Man. Co.*, 17
Conn. 249 ; *Sydeman* v. *Beckwith*, 43 Conn. 9 ; *Harford*

*County* v. *Wise*, 71 Md. 54; *Com.* v. *Sturtivant*, 117 Mass. 122; *Stewart* v. *State*, 19 Ohio, 302; *Com.* v. *Piper*, 120 Mass. 188; *Eidt* v. *Cutter*, 127 Mass. 522; *Leopold* v. *Vankirk*, 29 Wis. 548; *Curtis* v. *Railroad Co.*, 18 Wis. 312; *Indianapolis* v. *Huffer*, 30 Ind. 235; *Innis* v. *The Senator*, 4 California, 5; *Waters' Pat. Heater Co.* v. *Smith*, 120 Mass. 444; *Hawks* v. *Charlemont*, 110 Mass. 110; *Hackett* v. *Barton, &c.*, 35 N. H. 399; *State* v. *Shinborn*, 46 N. H. 501; *Goodwin* v. *State*, 96 Ind. 557; *Yohn* v. *City of Ottumwa*, 60 Iowa, 432; *Jones* v. *State*, 71 Ind. 84; *Smith* v. *State*, 2 Ohio St. 515; *Chicago, &c., R. R.* v. *Champion*, 32 N. E. R. 874; *Reeve* v. *Dennet*, 145 Mass. 123; *Weeks* v. *State*, 3 S. E. Rep. 323.

*George R. Gaither, Jr., Attorney-General,* for the appellee.

The evidence offered in the first exception was designed to contradict the witness upon a matter collateral to the issue. It would therefore be inadmissible as evidence for the purpose of contradiction, unless it should be considered as tending to prove bias on the part of the prosecuting witness and admissible for that purpose. It has been impossible for the Courts to lay down any accurate rules as to the admissibility of evidence in contradiction of a witness on the ground of bias, and it has been repeatedly stated that the admission or rejection of such evidence is a matter in the sound discretion of the Court under the facts and circumstances of each particular case. It is manifest that as an essential to the right of the party to contradict a witness on the ground of bias, the witness, who is sought to be attacked, should appear to have declared himself as free from bias against the accused party. In the case at bar the prosecuting witness, Towson, apart from any declaration that he was free from bias, practically admitted his bias when under cross-examination as to this very subject. He admitted that he went back and told Hoffman that his son could avoid being summoned by going away, and that he was concerned about Marshall Hoffman "one for him and two for

myself." It will be seen, moreover, that the prosecuting witness admitted the desire to get the son of Hoffman away before being summoned in the case, and it is difficult to see how the bias shown by this admission could be made any plainer by the additional alleged offer to pay his expenses. The bias was shown in endeavoring to get the witness away from testifying, not in paying his expenses. Then, too, in this case at bar the witness, Hoffman, had been already allowed by the Court to testify that Towson had stated to him " I did not quite get him (meaning the traverser) last winter, but I will get him now." It is therefore submitted that the Court below did not err, under the circumstances of the case at bar, in refusing to admit this evidence.

The second exception is based upon the refusal of the Court to allow the defendant to prove that a witness, John Unger, had, on May 27th, 1899 (the assault having taken place on May 2nd, 1899), taken a position similar to one described by two of the State's witnesses, and had not seen certain things which these witnesses had testified to. The uncertain and speculative character of such testimony, the independent issues raised before the jury as to conditions of atmosphere, time, location, observation of witnesses, etc., must be so apparent that it is difficult to see any theory upon which such kind of testimony could be admitted. Our trials would be interminable, and the issues infinite, if witnesses could be attacked or corroborated by any such system of evidence.

PEARCE, J., delivered the opinion of the Court.

The appellant was convicted in the Circuit Court for Washington County of assault with intent to kill Arthur L. Towson by shooting him with a pistol. During the course of the trial three exceptions were taken by the traverser to the exclusion of testimony offered by him, and these exceptions present the only questions for our determination. We will state such of the facts as are necessary to a proper understanding of the disposition of these exceptions. The

shooting occurred at ten minutes after eight o'clock on the evening of May 2nd, in a lane in Smithsburg, and there was no one present but Towson and the person who did the shooting. Towson testified that as he passed down the lane, he saw a man behind a tree ; that he had been shot at by some unknown person, near the same spot the night before ; that he advanced to the tree, and saw the person full in the face, and recognized the traverser whom he had known for years ; that the traverser stepped round the tree, and with his left hand fired at him and ran ; that he returned the shot and pursued ; that several running shots were exchanged, and the traverser escaped ; that later, about nine o'clock, he went to the postoffice and saw the traverser sitting with Harry Embley, at Brenner's corner. On cross-examination, he said he had heard Marshall Hoffman said, he had seen the traverser at Brenner's corner, at the very time of the shooting, and that he went on May 4th to see Marshall's father, Charles Hoffman, about it, and had a conversation with him. He was asked if he did not tell Charles Hoffman if he would send Marshall away until after the traverser's trial, that he, witness, would pay him wages during that time and expenses, and he denied making such statement. He was also asked if he did not subsequently return and ask Charles Hoffman not to say anything about that conversation, to which he replied that he had heard Marshall was scared about being summoned, and he went back and told his father that Marshall could avoid being summoned by going away. Being then asked if he was concerned about Marshall, he replied, " one for him and two for me." Charles Hoffman, for the defence, testified that Towson came to his shop May 4th, and among other things, said : " I did not quite get him (meaning the traverser) last winter, but I will get him now," and offered further to prove by him, that at the same time Towson asked what Marshall was doing, to which he replied that he was working when he could get work, and that Towson said, " if you will send him away until after trial of Richardson's

case, I will pay him wages and expenses," but that he re-
jected the proposition, and said his son should testify if
summoned to whatever he knew ; and that Towson then
left, but subsequently returned and asked him to say noth-
ing about what he had proposed to him.    This proffered
testimony was excluded, and its exclusion constitutes the
first exception.    To corroborate Towson's identification of
the traverser, Blanche Donaldson and Claude Ferguson tes-
tified that on the evening of May 2nd they were sitting on
a bench at the railway station at Smithsburg, and heard a
pistol shot in the direction of Towson's lane, at 10 min-
utes after eight o'clock, and several shots a few minutes
later ; that about five minutes after the shooting, some per-
son ran down the road to the railroad, and as he passed
under the street lamp they both recognized him as the
traverser, whom they knew well.    To contradict this testi-
mony, the traverser proposed to show by John Unger and
three other witnesses, all young men with good eye-sight,
that on Saturday and Sunday evenings, May 27th and 28th,
at 8.45 o'clock, they were in the seat occupied by Blanche
Donaldson and Claude Ferguson on May 2nd, and that
each of those evenings was clear, and the same street lamp,
in the same condition as on May 2nd, was burning with its
usual brightness ; that while they were thus seated, two
persons, in pursuance of previous arrangement, both well
known to all of them, but neither resembling the other, came,
one at a time, from Towson's lane, passed over the railroad
and under the street lamp, as it had been testified the
traverser did, and that it was impossible for anyone of the
four present to identify either person so passing, or to deter-
mine which of the two came first, and that no changes had
taken place in the surroundings of the seat or of the lamp,
except that the foliage of a locust tree near the lamp was
denser on the last occasion, but that it did not obscure the
view from the seat to the lamp ; and proposed further to
ask these witnesses from the observations made by them,
whether in their opinion it would be possible to distinguish

the traverser from Percy Embley, under the circumstances testified to by Blanche Donaldson and Claude Ferguson; Percy Embley having testified that he fired the shot in joke, and then ran past the station and street lamp in the manner described. The Court excluded the testimony thus offered, and its exclusion constitutes the second exception.

On cross-examination, Towson was asked if he did not call on M. Carper on May 4th at his hotel and ask him if he did not know something about Richardson shooting at him, to which Carper replied " nothing but hearsay, and that does not count," and if he, Towson, did not then say, " Mr. Carper, we propose to pay for our evidence, and pay well for it," all of which Towson denied. The traverser subsequently offered to show by Carper that Towson did make the statements which he denied, but the Court refused to allow the contradiction, and this refusal constitutes the third exception. The first and third exceptions may be conveniently considered together, and the second exception will be first considered.

It appears from examining the testimony of Blanche Donaldson and Claude Ferguson, that though they saw the person full in the face as he came down the road, they did not identify him until he passed the lamp, which was 94 feet from them. Their sole means of identification was the light of the street lamp, at the moment when the side of his face, 94 feet distant, was turned to them. While their testimony is positive and unqualified, it can from its very nature indicate only their conviction or opinion resulting from the facts observed by them, and might, or might not, be satisfactory to others with the same opportunities for observation, and the same acquaintance with the traverser. It was proper testimony, and unchallenged would doubtless be accepted as convincing. But let us suppose that the witnesses whose testimony was excluded, had been sitting beside Miss Donaldson and Ferguson at the moment this person passed, and that their knowledge of Richardson and their capacity for observation, were equal in all respects to that of Miss

Donaldson and Ferguson, and that they had been called by
the defence to prove that notwithstanding these facts not
one of the four was able to identify the person passing ;
can it be supposed that their testimony could have been
properly excluded ? And if not, is there any rational ground
either in common experience, or in the rules of evidence,
upon which it should be excluded as it was offered ? The
testimony of Miss Donaldson and Ferguson was but their
narration of the effect produced on their minds by the facts
observed ; but upon sound legal principles, it becomes *pri-
mary evidence*, because the conditions producing that effect
could not be reproduced in concrete form to the jury.
Wharton says this is especially true in questions of identifi-
cation "where a witness is allowed to speak as to his opin-
ion or belief" (*Crim. Ev.*, sec. 459). And again, he says
in sec. 807, " In questions of identity we have after all to
go back to opinion." In *Commonwealth* v. *Dorsey*, 103
Mass. 420, CHIEF JUSTICE CHAPMAN said : " In testifying
to the identity of a person, the statement often can be noth-
ng more than belief or opinion. This is especially so when
the person is seen in the night, or at a distance, or for a
very short time." And in the case before us, all the elements
of uncertainty and doubt mentioned by him are found.
The cases show that whenever the witness has had the
means of observation, and the facts and circumstances which
lead his mind to a conclusion are incapable of being detailed
and described so as to enable anyone but the observer
himself to form an intelligent conclusion from them, the wit-
ness is allowed to give his own opinion or the conclusion of
his own mind. This is the principle upon which the testi-
mony of Miss Donaldson and Ferguson had value, and was
admitted, and upon which the testimony of Unger and his
companions, if they had been present also, whatever the re-
sult of their observation, whether to confirm or contradict,
would have been equally admitted. But it may be said
their observation was not of the same facts, but was a mere
experiment ; the observation of other, though analogous

facts, and therefore neither these facts nor the opinion resulting therefrom are admissible. Upon principle, we can discover no sound cause for such distinction. If the brilliancy of the lamp at that point on May 2nd was such as to enable Miss Donaldson and Ferguson to identify Richardson under the circumstances stated, it should have enabled Unger and his companions on May 27th and 28th, their vision being equally good, to identify a person equally well known to them, under precisely similar conditions and circumstances. This is a proposition which ought not to require argument for its support. The record shows that the conditions were as nearly identical when the experiments of Unger were made, as it was in human care and caution to have them. The seat at the railroad and the street lamp were the same, and in the same locations; the lamp was burning with the same power and brilliancy; the season of the year, and the atmospheric conditions, were the same; the hour about 35 minutes later only, but at that date the sun set twenty-five minutes later than on May 2nd, and the decline of the natural light must have been about the same; no cause can be suggested for any difference in the diffusion of light from the lamp, and there was no change in any of the surroundings of the place.

In *Yates* v. *People*, 32 N. Y. 509, where the question was the capacity of the traverser to identify the deceased, whom he had killed, as a police-officer, by his uniform, cap and shield, by the light of a street lamp, at nine o'clock on the evening of October 1st, evidence was offered of an experiment made January 21st following at the same lamp and the same hour, and the evidence was excluded; not, however, because it was *per se* inadmissible, but because the seasons of the year were different, involving probable different atmospheric conditions, and because there was no offer that the conditions and power of the light were the same, or that the general surroundings were the same. But in *Chicago, St. Louis and P. R. R.* v. *Champion*, 32 N. E. Rep. 874, where an accident had occurred in the manage-

ment of a hand-car, evidence of an experiment with a *similar* car, with the same brakeman in charge, on the same siding, and under the same circumstances, was held, on appeal, to have been improperly excluded by the trial Court. The case of *Smith* v. *State*, 2 Ohio St. 511, presents an interesting examination by JUDGE THURMAN of the legal principles by which such evidence should be tested. Holcombe had been fired upon at night through the window of a tavern while stooping to take some books from a table near the window. He testified that he saw through the glass a man very close—with arm extended, and a pistol in his hand, directed at him, and that he *thought* it was the defendant; that at the moment the pistol was discharged, and by the flash he distinctly saw and positively recognized the defendant. The State also examined other witnesses, not present at the shooting, as to experiments and observations made by them at that window, under the same circumstances in all respects as those of the actual shooting, and as to their opinion of the results, for the purpose of proving by inference from such observations, that Holcombe could have seen and recognized the defendant as he swore he did. The defendant then offered to prove by other witnesses that shortly after the shooting, at another spot than that where it had occurred, they had made experiments as nearly as possible similar in all respects to those of the State, and that though they could see the person on the outside of the window, they could not distinguish nor identify him, either before the firing, or by the flash at the discharge of the pistol. The trial Court excluded all the facts offered in evidence, but permitted the witness, as an expert in the laws of light and vision, to state his opinion as to the effect of the sudden light made by the discharge of the pistol. The exclusion of the facts and of the resulting opinion thereon was held error by the Supreme Court, JUDGE THURMAN saying : "It was certainly lawful to disprove Holcombe's statement by showing the impossibility, or the natural improbability of its being true, but it is said this could not be done by proof of

experiments.   If not, how could the proof be made ?   No
one but Holcombe was looking through the window when
the crime was committed.   No one but he saw the pistol
fired, or the person who did it.   Direct contradiction by
eye-witnesses was therefore impossible, and would perhaps
be equally impossible in a large majority of the cases.   Un-
less then proof of experiments is receivable, a man is very
much at the mercy of another who swears against him, and
perjury, or mistake, however great, instead of incurring
punishment or being rectified, may answer to produce con-
viction.   It was also argued that the State cannot come pre-
pared to meet proof of facts that are not part of the *res
gestæ*.   But the credibility of testimony is always in issue,
and the State must come prepared to maintain the credibility
of hers.   Finally it is said, that notwithstanding the result
of the experiments, it is possible Holcombe saw what he
said he did.   Granted.   But what of that ?   It was not in-
dispensable to the defence to prove the utter impossibility of
his statement.  Evidence that tended to show its improbability
was competent, and such evidence, if it did not convince,
might at least have raised a reasonable doubt in the minds ·
of the jury.''   These observations are so sensible and just ;
they come from so high a source, and throw so clear a light
upon the question before us, that we have felt justified in
repeating them, and we are clearly of opinion that the evi-
dence offered under the second exception was competent,
whatever may be its weight, and should have gone to the
jury for their consideration.

The first and third exceptions are substantially the same.
The first presents the question whether one who has denied
offering a bribe to a witness to prevent his giving testimony
in that cause, may be contradicted by the person to whom
the bribe was offered.   The third is, whether the same wit-
ness who has also denied offering a bribe to another witness
to induce him to testify in that cause, after the witness has
informed him he knows nothing but hearsay, may be con-
tradicted in like manner.   It was contended that he cannot,

because of the well-established rule of evidence, that where a witness on cross-examination has answered a question collateral to the issue, such answer cannot be contradicted. But this rule leaves undeclared what is within the cases, irrelevant or collateral for the purpose of excluding the contradicting evidence.    In the leading case of *Atty.-Genl.* v. *Hitchcock*, 1 Exchequer, 91, CHIEF BARON POLLOCK says: " The test whether the matter is collateral is this ; if the answer of a witness is a matter which you would be allowed on your part to prove in evidence ; if it have such a connection with *the issue* that you would be allowed to give it in evidence, then it is a matter on which you may contradict him." In that case, it was held that a witness who had denied on cross-examination that he had said the officers of the crown had offered him a bribe to testify as he did, could not be contradicted by proof that he had so said, and we have no occasion to doubt the correctness of that decision. As was said in the course of that opinion : " It is totally irrelevant to the matter in issue that some person should have thought fit to offer a bribe to the witness to give an untrue account of a transaction, and it is of no importance whatever, *if that bribe was* not accepted.    It is no disparagement to a man that a bribe is offered to him. *It may be a disparagement to the person who makes the offer.    Lord Stafford's case,* 7 How. St. Trials, 1400, was totally different. There the *witness* himself had been implicated in offering a bribe to some other person.    That immediately affected him as proving that he had acted the part of a suborner for the purpose of perverting the truth.    In that case the evidence was to show that the witness had offered a bribe in the *particular case*, and the object was to show that he was so affected towards the party accused as to be willing to adopt any corrupt course in order to carry out his purpose." And BARON ALDERSON said in the same case : " The evidence is receivable as tending to show that the man who himself came to give evidence against Lord Stafford, was embittered against him, and had endeavored to persuade

other people to give false evidence on the same side. That had a tendency to show that his testimony could not be relied on by the jury." In *Regina* v. *Burke*, 8 Cox, Crim. Cases, 44, the above case was reviewed by nine judges and was held to have placed the rule of law upon reasonable ground, and all the judges agreed that the rule of exclusion does not embrace cases "where the matter inquired into is of a kind which brings a witness into special connection, in some way, with the subject of the issue, or with one of the parties to the issue, as where the matter inquired into is whether the witness has not received a bribe from one of the parties, or whether the witness was not living as the mistress of one of the parties." The inquiry in the case before us, is precisely that in *Lord Stafford's case* (7 Howell's State Trials, 1400), and falls directly within the reasoning of *Regina* v. *Burke*, *supra*, and of *Moriarty* v. *London and Dover R. W.*, L. R. 5 Q. B. 319, where CHIEF JUSTICE COCKBURN said : "If you can show that a plaintiff has been suborning false testimony, it is strong evidence he knew perfectly well his cause was an unrighteous one—and it is evidence which ought to be submitted to the consideration of the tribunal which has to judge of the facts, *inasmuch as it goes to show he thinks he has a bad case.*"

Here the witness is not technically a party, but as prosecuting witness, his position, for the purposes of this inquiry, is not distinguishable from that of a party. In *Wise* v. *Ackerman*, 76 Md. 394, it was proposed on cross-examination of a witness, testifying for plaintiff in a damage suit, to ask whether he had not said, in urging settlement of *another damage suit*, that he, as a medical witness in a former trial of the then pending case, had been instrumental in getting a big verdict for the plaintiff, and the question was not allowed. Upon appeal, this Court reversed the judgment, CHIEF JUSTICE ALVEY saying : " It was clearly within the scope of proper cross-examination, and upon the witness denying the use of the language imputed to him, it could be competent to prove what he did say, not with the view

of having a 'direct effect upon the issue, but to show what was the state of mind of the witness, his relation to the plaintiff, and his motive and temper in the particular transaction, so as to enable the jury to determine the weight due to his testimony, and this is in no proper sense collateral to the inquiry."

We think the testimony excluded under the first and third exceptions should have been admitted.

> *Judgment reversed and cause remanded for a new trial.*