# WALTER M. NEWKIRK

## *vs.*

## STATE OF MARYLAND.

*Criminal law: appeals; weight and sufficiency of evidence; not for court. Witnesses: experts; discretion of court; gunshot wounds; evidence deduced from experiments. Testimony: ruled out; subsequently admitted.*

On appeals in criminal cases, the Court of Appeals can not pass upon the weight or sufficiency of the evidence adduced to support the charge against the accused; that question is exclusively for the jury.                                    p. 312

The knowledge which a witness must possess before being entitled to give his opinion, as an expert, is largely in the discretion of the trial court.                              p. 318

Experiments tending to show that an occurrence could not have happened in the manner alleged are competent evidence in both civil and criminal cases; but it must be shown that such experiments were conducted under circumstances similar to those at the time of the occurrence in question.                 p. 318

A ruling against the admission of certain testimony does not present reversible error when the same evidence was afterwards fully admitted.                                          p. 319

*Decided April 8th, 1919*

Appeal from the Criminal Court of Baltimore City. (STANTON, J.)


The facts are stated in the opinion of the Court.


The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER and CONSTABLE, JJ.


*G. Ross Veasey* and *Albert S. J. Owens*, for the appellant.


*Albert C. Ritchie, Attorney General,* and *Philip B. Perlman, Assistant Attorney General,* (with whom were *William F. Broening, State's Attorney for Baltimore City, Roland R. Marchant, Deputy State's Attorney,* and *Harry W. Nice, Assistant State's Attorney,* on the brief), for the appellee.


BURKE, J., delivered the opinion of the Court.

Walter M. Newkirk was indicted for the murder of his wife, Daisy M. Newkirk in the City of Baltimore on the 28th day of November, 1917. The jury empanelled to try his case found him guilty of murder in the second degree. A motion for a new trial was made and overruled by the Supreme Bench of Baltimore City, and he was sentenced to be confined in the Maryland Penitentiary for the term of twelve years. The appeal before us was taken from that judgment. In the brief for the appellant it is said: "In reading the testimony, the Court will see that the accused was convicted upon a most remarkably meagre state of facts, and that none of the testimony that was given proved his guilt; that most of the testimony, if it established anything, established only the absence of testimony to convict. He was convicted by the 'hue and cry,' not as a result of the jury being convinced beyond a reasonable doubt of the guilt of the accused from evidence adduced in a regular and orderly way in a Court of Justice." This statement can hardly be correct

in view of the fact that the Supreme Bench overruled the motion for a new trial. The brief also contains two letters, which are not in the record, written to the counsel for the appellant in which the opinion is expressed that the bullet which caused the death of Mrs. Newkirk might, on the evidence, have been fired from a pistol in her own hand. But this Court can not pass upon the weight or sufficiency of the evidence adduced to support the charge that the appellant murdered his wife. That was a question exclusively for the jury. Nor can we in passing upon the questions raised by the appeal consider or base our judgment upon matters not contained in the record.

We will state such of the facts as are necessary to present the legal questions raised on the record and the principles upon which we dispose of them.

Walter M. Newkirk was married three times. He left his first wife, and she obtained a divorce from him. His second wife died leaving a little child named Evelyn. About eleven months after the death of his second wife, he married, in May, 1917, his third wife, Daisy M. Newkirk. Mrs. Newkirk had been previously married and had two children,—a married son and a daughter named Marion who was about six years old at the time of her mother's death. Newkirk was a traveling salesman and lived at No. 2 North East street in Baltimore City with his mother, a widow about sixty years of age, and his daughter Evelyn. In April, 1917, Lulu Alymer became a boarder in the Newkirk home. After his marriage to his third wife in May, 1917, Newkirk brought her and her little daughter Marion to his home where she lived until her death on November 28, 1917. Newkirk was away from home, engaged in his business, a great deal of his time, and the evidence shows that Mrs. Newkirk took a position with Schloss Brothers. There is evidence to the effect that Mrs. Newkirk's married life with the appellant was most unhappy. Shortly before her death she told her mother that when her husband came home she was going to see what he intended to do and if he did not intend to do better, she was

going to take her child and her clothes and come home to her. Katharine Mack, a witness called by the State, testified that Newkirk told her in September, 1917, that he had made the mistake of his life in marrying: "He did not say he was going to do away with her. He asked me not to marry. I told him I was going to get married. He said he had heard it. He said: 'Don't marry within a year; you never can tell what might happen.' That is all he said. He said: 'Don't make any mistake.' He said: 'Don't be sorry; don't do anything rash; don't be sorry for anything, because you never can tell what might happen in a year.' He never said that he would harm his wife. He never wanted to talk very much of her. He just said he disliked her."

Newkirk left Baltimore on one of his business trips in an automobile on November 6, 1917, taking with him a woman named Marie Grandon with whom he lived on the trip as man and wife. He returned to Baltimore about one o'clock on November 28, 1917, and rented a room on Fayette street in which he left his wardrobe trunk and travelling bag. He left Marie Grandon in the room and went out to have his car put in good condition. He went back to the room where he remained until about five o'clock. After getting supper at some place on Howard street he put Marie Grandon on the car and sent her home, and he went to his own home, arriving there about six o'clock. He went into the kitchen where he found his mother and the two children. He was sitting at the kitchen table reading some letters when his wife came in. After some little time Newkirk went into the dining room and put on his overcoat. Shortly before that Mrs. Newkirk had gone upstairs and returned. From the dining room there is a hallway leading to the front door. On the evening in question there was no light either in the dining room or hall. Mrs. Katharine Newkirk, the mother, was in the kitchen when her daughter-in-law was shot, and she knew nothing as to how she was shot. She said her son and his wife were talking in the dining room and then went into the hall where they stood and talked for a while. She did not know what

they were talking about, or that Mrs. Newkirk had been shot until her son told her that his wife had shot herself.

Walter M. Newkirk was the only person present when his wife was shot, and the following extracts from his testimony give his version as to how she met her death: "I got up and as I passed Bessie she followed me in the dining room. I put my overcoat on. I turned around to her and she had her hands behind her, and said, 'Walter, do you intend to continue doing as you have been doing?' And I said, 'What do you mean?' And she said, 'Well, will you tell me if you intend staying away on the road like you have been doing?' I said, 'Yes, this is the best time in my business; if I don't make the dollar this time I can not make it when the weather is bad.' Owing to our having good weather that time I stayed away from home longer than I do as a rule. She said, 'The neighbors are talking about me something scandalous,' and I said, 'What are the neighbors saying?' She started to tell me, I said, 'Who are the neighbors?' She said, 'People get telephone calls.' I took it for granted it was the next door neighbor. She said, 'Even my aunt reprimanded me.' And I said, 'Your aunt reprimanded you about what?' And she could not tell me or she would not tell me. I said, 'Tell me what the neighbors and your aunt are saying and I will go see them.' She could not do that. She said, 'Are you coming back again?' When I first got up out in the kitchen to go put my coat on, to be absolutely truthful, I had no idea of coming back that night, but when she asked me if I was coming back I said, 'Yes, I will return in a few minutes,' and she asked me where I was going, and I told her that I was going around the corner to get a couple of drinks and see some of the boys. I had not been drinking anything up to that time since election day, which was the last time I had had a drink. I came home on the morning of the second of November; I had not intended to come home, but owing to a call from my firm to attend a convention in New York, I dropped off in Baltimore, only staying home a few minutes, and then went straight on to New York. I don't remember

whether I saw my wife that morning or not, or whether she
was at home or had gone to work, and she had gone to work
against my wishes. I went out in the hall and she followed
me out. As a rule, when I go to the front door, I leave doors
open behind me, if anybody is going along with me or if
anybody is behind me, but I am a little ahead of my story—
getting too enthusiastic. My wife asked me if I was going
with any woman; she had somebody in mind. I told her,
'No, if I went with anybody it would be with them all,' and
then when I started out she followed me, I leaving the door
open. As soon as she got in the hallway she pulled the door
shut, and at that instant the gun went off, and she said, 'My
God, I shot myself.' I ran to her, and opened the door and
hollered to my mother. * * * My wife asked me that night,
when I was preparing to go out, if I was coming back and I
told her that I was going around to get a couple of drinks
and would return in a short while, perhaps an hour's time.
I fully intended to return, because there is one thing that I
do, when I say I will do a thing, I come pretty near doing it.
I did not tell her that night that I had finished living with
her and never expected to live with her again. Not in those
words. When she asked me if I intended to do that, I told
her that I was taking care of that house and that I would
continue to take care of it and asked if that was not satisfac-
tory to her, and she did not answer me. I did not tell her
that I would not live with her any more, but I did say that
I was going to play the field * * * I had a pistol, which I
kept at home for the benefit of the ladies, my mother, and
my previous wife, and my wife Bessie, when I was away on
the road. I last saw this pistol about the time I packed my
grip to go away on that last trip; it was then lying in the
chiffonier drawer; I never had it loaded, and I don't think
at that time it was loaded; if it was, I knew nothing about
its being loaded. Before I went to the station house I asked
Captain Morheiser to step upstairs with me to see if that
gun was—to see if my gun was still in the chiffonier drawer,
and Captain Morheiser allowed me to open that drawer and

look, and we failed to find the gun in the drawer, and I, therefore, take it for granted that was my gun, otherwise I could not swear that it really is, because I am not familiar with it."

Mrs. Newkirk died almost instantly. Her body was carried into the dining room, and when Doctor Beetham arrived the pistol with which the shooting was done was found on the dining room table. Newkirk said he did not know whether or not he picked up the pistol. No one ever saw Mrs. Newkirk with a pistol, and no one, other than Newkirk, testified that there was a pistol in the house and no one ever heard Mrs. Newkirk threaten to take her own life, although she was greatly troubled and depressed, and her health much broken,—conditions which the testimony tends to show were due to the neglect and marital infidelities of her husband. There is evidence in the record that Newkirk said he carried a pistol on his trips. This he did not deny.

A post mortem examination of the body of Mrs. Newkirk was made by Dr. Henry G. Branham, assistant medical examiner of Baltimore City. It showed that she died from a gun shot wound of the right chest,—the ball entering two inches above and three inches to the left of the right nipple, and that the ball went from right to left and from below slightly upwards. There were powder marks on the palm surface of her right hand, and powder grains burned in the wrist of the right hand from explosion, and the white shirt-waist which she wore at the time she was shot was burned, but to what extent the record does not show.

During the examination of Doctor Branham the appellant reserved six bills of exceptions to the rulings of the Court. In the first exception it appears that, after describing the location and nature of the wound which caused Mrs. Newkirk's death, the doctor used the pistol with which the wound was inflicted to which he attached a stick, and used the pistol and stick to explain or illustrate his testimony as to the course of the bullet. We can see no possible error in this ruling. The State asked Doctor Branham what had been the extent

of his experience with reference to the effect of gunshot wounds and what experiments he had made. The traverser objected to this question and the Court overruled the objection. This constitutes the second exception. The doctor answered this question as follows: "I said there has been quite a number of murders from gunshot in Baltimore within ten years; I do not know the number of murders; and naturally we examined all these wounds, and in quite a few of these cases it was also necessary to continue experiments after the post mortems." The witness, continuing, testified as follows: "We made experiments on cloth, flesh and other things. I continued the experiments in this particular case." As the object of these questions and answers was to show that Doctor Branham was qualified to testify to the experiment which will be presently considered, the ruling was proper. In the third, fourth and fifth exceptions it appears that in making the experiments the doctor used the same revolver, and partly the ammunition found in the revolver after Mrs. Newkirk's death, and partly the ammunition found in the bureau drawer in the Newkirk home,—some of the same variety of ammunition. When we come to the consideration of the principles of law relating to the introduction of experiments, it will be manifest that the rulings embraced in these exceptions were correct. To determine at what distance from Mrs. Newkirk the pistol must have been held to have caused the burned effect found upon her waist, light cloth,—cheese cloth was used. The sixth exception was taken to the following question asked Doctor Branham: "Now, Doctor, from the experiments that you made, and from your general knowledge of this subject, how far would the muzzle of the gun have to be from a body in order to produce the burned effect that has been produced on this waist, and the condition which you found to exist on the body of Daisy Newkirk at the time of the post mortem?" His answer was, between fifteen and eighteen inches. The purpose of this evidence was to show that Mrs. Newkirk did not kill herself, as claimed by the appellant. Was Doctor Branham qualified to make the experiments? In *Chateaugay*

*Ore & Iron Company* v. *Blake,* 144 U. S. 476, it was said:
"The amount of knowledge which a witness must possess be-
fore a party is entitled to his opinion as an expert, is a mat-
ter which must be left largely to the discretion of the trial
Court, and its ruling thereon will not be disturbed unless
clearly erroneous." 12 *Am. & Eng. Ency. of Law* 422;
*Balto. & Yorktown Tpk. Co.* v. *Crowther,* 63 Md. 558. Doc-
tor Branham had previously stated his familiarity and ex-
perience with gun shot wounds, and we think he was suffi-
ciently qualified to make the experiments he described.

Were these experiments admissible? They tended strongly
to refute the testimony of the husband that the wound which
caused his wife's death was self-inflicted. In a note to the
case of *Fisher* v. *Travelers Ins. Co.,* Vol. 25 Ann. Cases,
1912 D., p. 1246, it is stated upon the authority of many
cases in different States, that:

First—The rule may be said to be well established that
experiments tending to show that an occurrence could not
have happened in the manner in which it is alleged to have
happened are competent evidence in both civil and criminal
cases.

Second—The rule above stated is subject to the qualifi-
cation that in order for such experiments to be competent
evidence it must be shown that they were conducted under
*similar* or *substantially* similar conditions as those existing
at the time of the occurrence in question. This statement of
the law is in accord with that announced and applied in
*Richardson* v. *State,* 90 Md. 109.

We have above stated the conditions under which Doctor
Branham made his experiments, and we are of opinion that
these experiments were made under conditions which ren-
dered their admission in evidence proper under the principles
stated.

The Court sustained an objection by the State to the fol-
lowing question asked Lulu Aylmer on cross-examination:
"Now, will you tell the gentleman of the jury such actions
as you noticed about Mrs. Newkirk in reference to her nerv-

ousness, and statements that she made—in reference to her taking her life?" This ruling constitutes the seventh exception. No injury was done by this ruling as the witness was subsequently called by the appellant and testified fully as to the matters sought to be elicited by the above question. The eighth exception was taken to the admission in evidence of a statement made by the appellant to Captain Harvey P. Morheiser of the police force of Baltimore City, on the night of his wife's death. There was no reversible error in this ruling, as the traverser as a witness testified fully to the same things embraced in his statement to Captain Morheiser.

The remaining exceptions were taken to the allowance by the Court of questions asked the traverser designed to show that he had lived in adultery with a woman named Katharine Mack. We do not think it necessary to discuss these exceptions. He denied all improper relations with her during the time he was married, and his evidence on this subject is uncontradicted, and we do not think, after his open admissions of his relations with Marie Grandon and his statement to his wife that he was "going to play the field," that he could have been injured by anything embraced in these exceptions.

*Judgment affirmed.*