# ALLISON *v.* STATE

[No. 164, October Term, 1952.]

*Decided July 2, 1953.*

The cause was argued before SOBELOFF, C. J., and DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*James C. Morton, Jr.,* with whom were *Edward S. Digges* and *Oscar Duley* on the brief, for the appellant.

*Ambrose T. Hartman, Assistant Attorney General,* with whom were *Edward D. E. Rollins, Attorney General, C. Osborne Duvall, State's Attorney for Anne Arundel County,* and *Robert T. Barbour, State's Attorney for Charles County,* on the brief, for the appellee.

HENDERSON, J., delivered the opinion of the Court.

Homer A. Allison, a staff sergeant in the Air Force stationed at Andrews Air Force Base and residing at Clinton, Maryland, with his wife and three small children, was indicted in Charles County for the murder of his wife. The case was removed to Anne Arundel County where he was tried before a jury and acquitted of murder but convicted of manslaughter and sentenced to two years in the Maryland House of Correction. The appeal challenges certain rulings on the evidence and the legal sufficiency of the evidence to support the verdict.

On September 6, 1952, Allison and his wife, who was seven months pregnant, left their children with a baby-sitter and drove in his car to an inn in St. Mary's County. Two young ladies, friends and neighbors of the Allisons, accompanied them. It was Saturday night and they drank and danced. Allison had four or five highballs; Mrs. Allison had three drinks. Some time after midnight, when Mrs. Allison returned from making a telephone call to her home, she saw Allison with his arms around the shoulders of the two girls and made a scene. She slapped him several times, said he was making a fool of himself, and demanded that he take her home. The young ladies remained at the inn; Allison drove off with his wife. According to Allison she continued to slap and upbraid him in the car. He had a black eye the following day.

In the course of the ride, Mrs. Allison in some way fell from the car while it was travelling at the rate of over fifty miles an hour. She died some hours later as the result of injuries sustained, at a hospital in LePlata where he took her. Allison made a number of inconsistent statements as to how she got out of the car. He told two witnesses at the scene of the accident that she "fell out". He told the police officers that she jumped out because she was angry. He told attendants at the hospital that she just disappeared and he did not know how she got out of the car. The

witness Hamby, who assisted in carrying her into the hospital, testified that Allison told him "we were fighting—I either pushed her or kicked her out of the car." Allison was also vague in his recollection of other details. For example, he stated that there were no witnesses at the scene of the accident. He could not explain certain damage to the car, including damage to the right front door which prevented it from opening, and denied that he had been in an accident on the way to the hospital. It was shown, however, that in fact he had collided with the rear of another car, which may have accounted for the damage.

The witnesses Posey and Farrell testified that they were driving behind Allison when they suddenly saw a body lying in the right hand lane with its head toward the center, and saw Allison stopping some distance ahead. They swerved around the body and stopped on the extreme left. They saw Allison backing up rapidly in the right hand lane. They got out and then saw him standing over the body which was in front of his headlights. They assisted him in placing the body in the rear seat of his car and had a conversation about the nearest hospital. While they did not see Allison's car pass over the prostrate body, there is a strong inference that it did. There was police and medical testimony that human blood and hair were found on the underbody of the car, and blood on the right front tire and the bumper. Allison admitted that he continued backing until his wife's body was visible in his headlights. He told one witness that in backing he "heard a slight bump". He admitted on the stand that he may have backed over her, he could not say. The cause of death was first found by the medical examiners to have been a cerebral hemorrhage due to a fractured skull, but a post-mortem examination showed extensive hemorrhages, in the vicinity of the uterus, that were a contributing cause of death. The medical witnesses could not say definitely that the tires passed over the body,

but there was testimony to bruises on the legs above the knees.

We think there was legally sufficient evidence to warrant the submission of the case to the jury. If Hamby's testimony as to Allison's admission to him is to be believed, Allison's push or kick was the cause of her fall. The weight of this testimony and its credibility were for the jury. Cf. *Terry v. O'Neal,* 194 Md. 680, 689, 72 A. 2d 26. See also *Edwards v. State,* 198 Md. 132, 157-158, 83 A. 2d 578, 581, *Auchincloss v. State,* 200 Md. 310, 316, 89 A. 2d 605, 607, and *Chisley v. State,* 202 Md. 87, 92, 95 A. 2d 577, 579. The manner in which Allison operated his car after the fall was also a circumstance to be considered, as bearing upon the recklessness of his conduct and his state of mind. The testimony is clear that Mrs. Allison was not dead at that time, but died some hours later at the hospital. The jury found him not guilty of murder, but guilty of manslaughter. Malice is, of course, an essential ingredient of murder, but even an unintentional killing may constitute the crime of manslaughter if it is due to a wanton and reckless disregard of human life. Cf. *Hughes v. State,* 198 Md. 424, 432, 84 A. 2d 419, 422, and *Neusbaum v. State,* 156 Md. 149, 155, 143 A. 872. See also *Barbeau v. United States,* 9 Cir., 193 F. 2d 945.

Defense counsel contend that the court improperly limited their examination of witnesses to show an abnormal state of mind on the part of Mrs. Allison on account of her pregnancy. We do not find error in this respect. The witness Catherine Goodin, a neighbor, was permitted to testify that Mrs. Allison was "sort of upset", largely because of an unsuccessful hernia operation she had had just prior to her pregnancy, but that they were a happy couple. Allison testified to the same effect. He said she was nervous and irritable because of the incident at the inn, but they had had no previous quarrel, just normal arguments. He knew of no reason why she should leave the car. He denied that she had ever threatened to take her life, or had

otherwise shown any violence or suicidal tendencies. There was no proffer to show anything of that sort.

An obstetrician was called on behalf of the defense and he was asked whether he agreed with certain statements, read to the jury from a text book on obstetrics, to the effect that pregnant women are impressionable and subject to varying moods or heights of excitability. He was also asked whether it had been his experience that "a woman during pregnancy is more apt to be emotionally unstable than the same woman during her non-pregnant period." Objections to these questions were sustained. We find no error. Medical text books are not admissible as such or in the direct examination of experts. *Davis v. State,* 38 Md. 15, 37; *Eckels v. Cornell Economizer Co.,* 119 Md. 107, 114, 86 A. 38. See also note 65 A. L. R. 1102. Both questions were too general. Of course, an expert may be asked to give his opinion on facts that he has heard testified to, or on a hypothetical question based on evidence in the case. Cf. *Damm v. State,* 128 Md. 665, 673, 97 A. 645, and *Newkirk v. State,* 134 Md. 310, 317, 106 A. 694. But it is well settled that the opinion must be based on the facts in the case. *Clautice v. Murphy,* 180 Md. 558, 567, 26 A. 2d 406; *Mathiesen Alkali Works v. Redden,* 177 Md. 560, 565, 10 A. 2d 699.

Defense counsel finally contend that the court erred in excluding the official service record of the accused in the Air Force. They state that they were prepared to show that he was inducted into service in 1943, served overseas as a tail-gunner in a B-29 bomber with thirty-five missions, received an honorable discharge in 1945, re-enlisted in 1946, and has been a member of the Air Force ever since. Also that he received the D. F. C. and other decorations, including one for serving in the Berlin Air-lift and a good conduct medal. As a matter of fact they asked the accused when he took the stand, without objection, about all of these matters, except the list of his decorations. Nor was the service record ever offered in evidence. The inquiry on which

the court ruled was addressed to a Major in the Air Force and sought to elicit: "what your records reveal as to the good conduct of Homer Allison." In short, they sought to prove good character by recourse to details in the service record.

The appellant relies upon a statement in 1 *Wigmore, Evidence* (3d Ed.), Sec. 59, that a certificate of honorable discharge "is virtually a summary of his entire service conduct, both as a man and as a soldier. * * * it implies a career successfully negativing all of the more common traits involved in criminal charges. In this respect it is therefore more comprehensive than the ordinary community-repute to general good character, and is entitled to be used on behalf of an accused on virtually any specific charge of serious crime."

There is virtually no support for Wigmore's doctrine in the decided cases. It may be admitted that the reasons assigned for exclusion are not always satisfactory. It is clear that a service record should not be excluded under the hearsay rule, for it is an official record made in the regular course of business. 5 *Wigmore, Evidence* (3d Ed.), Sec. 1675(a). Thus, where it became material to show the defendant's familiarity with weapons, a discharge certificate showing he had qualified as a marksman was held properly admitted. *Commonwealth v. Steele,* 362 Pa. 427, 66 A. 2d 825. It may also be admitted that particular instances of good conduct, or a summary leading to an honorable discharge, may have logical relevancy, despite some expressions to the contrary. Cf. *Cohen v. State,* 173 Md. 216, 229, 195 A. 532, 196 A. 819, and *Hodge v. United States,* 13 F. 2d 596 (C. C. A. 6th). But the help to be gained by knowledge of a man's background must always be balanced against the misleading effect of collateral issues. Moreover, Wigmore's doctrine seems inconsistent with the established Maryland rule that character witnesses called by the defense can testify only to general reputation, although this may be tested in cross-examination by reference to particular reputed

acts, *Comi v. State,* 202 Md. 472, 97 A. 2d 129, and that the reputation must be limited to the neighborhood where the accused resides, and not where he is employed. *Markley v. State,* 173 Md. 309, 320, 196 A. 95, and cases cited. See also *Berger v .State,* 179 Md. 410, 414, 20 A. 2d 146, and *Bonaparte v. Thayer,* 95 Md. 548, 52 A. 496. Wigmore is consistent in that he strongly condemns this limitation. 5 *Wigmore, Evidence* (3d Ed.), Sec. 1616.

The cases in other jurisdictions almost uniformly hold that good character may not be shown by a service record or certificate of honorable discharge. See *State v. Sbrilli,* 136 N. J. L. 66, 54 A. 2d 221; *Ridgell v. United States,* D. C. Munn. App., 54 A. 2d 679; *Hoke v. Atlantic Greyhound Corp.,* 227 N. C. 412, 42 S. E. 2d 593; *Cox v. State,* 31 S. 2d 378, 33 Ala. App. 192; *Ray v. State,* 159 Fla. 101, 31 S. 2d 156; *State v. Stoller,* 107 Utah 429, 154 P. 2d 649; *State v. Taylor,* 293 Mo. 210, 238 S. W. 489. See also notes 172 A. L. R. 729, and 9 A. L. R. 2d 606. In *Timmins v. Hale,* 122 Or. 24, 256 P. 770, while the court cited Wigmore's view with apparent approval, the holding was that the admission of a certificate of honorable discharge was not prejudicial error. We find no error in the ruling in the case at bar.

*Judgment affirmed, with costs.*