STATE v. MACK ATWOOD.

(Filed 29 April, 1959.)

**1. Criminal Law § 53:    Homicide § 14—**

Where, in a homicide prosecution, defendant contends that deceased committed suicide, it is competent for an expert witness who has testified as to the angle the bullet entered the body of deceased, to stand up and point the pistol at his own body at such angle to demonstrate his testimony that it was physically difficult to get his arm in a position to shoot a bullet at such angle.

**2. Same—**

Where, in a homicide prosecution, defendant contends that deceased committed suicide, it is competent for an expert witness to testify from his examination of deceased's clothing, skin tissue taken from deceased's body, the pistol and the ammunition used, that the fatal shot was fired by a pistol not closer than 40 inches from deceased, and that the size of the wound of entry did not indicate a contact shot.

**3. Same:    Criminal Law § 38—**

Testimony of an expert as to the amount of powder burns left on white blotting paper when similar ammunition was fired from the death pistol at various distances is competent in explaining his testimony, based upon powder burns in deceased's clothing and in deceased's body around the wound, as to the distance the pistol was from deceased's body when the fatal shot was fired.

**4. Criminal Law § 162—**

Where the State introduces an exhibit without objection, but defendant's objection to testimony of witnesses in regard thereto is sustained, and the court charges the jury not to consider the exhibit or any evi-

dence relating thereto, defendant's objection to the admission of the exhibit is untenable.

**5. Criminal Law § 85—**

The State, in offering in evidence statements of defendant that deceased had the pistol in his own hand and had himself fired the fatal shot, is not precluded from showing by the testimony of other witnesses that the facts in regard to the firing of the pistol were otherwise.

**6. Homicide § 20—**

The State's evidence tending to show that defendant intentionally shot deceased with a pistol, inflicting fatal injury, is sufficient to be submitted to the jury and support a conviction of murder in the second degree.

HIGGINS, J., took no part in the consideration or decision of this case.

APPEAL by defendant from *Preyer, J.,* September Term 1958 of ALLEGHANY.

Criminal prosecution on a bill of indictment charging first degree murder.

When the case was called for trial, the Solicitor for the State stated that he would put the defendant on trial for second degree murder or manslaughter.

Plea: Not Guilty. Verdict: Guilty of murder in the second degree.

From a judgment of imprisonment, defendant appeals.

*Malcolm B. Seawell, Attorney General, Claude L. Love, Assistant Attorney General, and Bernard A. Harrell, Staff Attorney, for the State.*

*R. Floyd Crouse, Worth Folger, J. Erle McMichael and Deal, Hutchins and Minor for defendant, appellant.*

PARKER, J. At the close of all the evidence, defendant made a motion for judgment of nonsuit. G.S. 15-173.

The State's evidence is in substance as follows: About 2:00 a. m. on Sunday, 2 February 1958, Talmage Whitaker, a 26-year-old man, and the defendant were in a small storage room adjoining a large room in which defendant operated a beer parlor and grocery store. While there, a bullet fired from a 32 caliber Smith & Wesson pistol with a four-inch barrel, belonging to defendant, entered the front of Talmage Whitaker's chest and went through his body. About 3:00 or 3:30 a.m. on the same morning, Dr. Gayle Jackson Ashley, found by the trial court to be an expert witness as a physician, examined Talmage Whitaker's dead body in the emergency room at a hospital.

STATE *v.* ATWOOD.

In his opinion, his death was caused by the above described wound.

About two weeks before Talmage Whitaker was killed, Hallie Blevins Hamm was in defendant's place of business. A conversation came up about George Whitaker. The defendant said: "He did not like none of the Whitakers, none of the damned Whitakers." She was in defendant's place of business a short time before Talmage Whitaker was killed. Defendant said: "He and Talmage were good friends, and he got up a conversation about the Whitaker boys and said he and Talmage were good friends, that Talmage had worked for him and that Talmage was in there the night before and called for some money he owed him and he was not going to pay it, that if he came back in there, he would stick a bullet in his damned guts."

About midnight of the night Talmage Whitaker was killed, Richard Andrews was at defendant's place of business. The defendant, Talmage Whitaker, Bert Reeves, Morris Moulder, a boy he did not know, and defendant's wife were present. While there he heard a conversation between defendant and Talmage Whitaker as follows: "Mack said to Talmage, 'You told Old Bell. I know you did,' and Talmage replied, 'No, I didn't.' Talmage started walking away and Mack said, 'You are a g. d. s. o. b. and a liar. I know you did,' and Talmage repeated, 'No, I didn't.' Then Mack said something else, to which I did not pay too close attention, and that he, Mack Atwood, talked to Talmage Whitaker in a kind of rough tone of voice, and that I saw no gun there that night. That I stayed there 15 or 20 minutes."

About midnight on 1 February 1958, or shortly thereafter on 2 February 1958, Bert Reeves, his friend, Morris Moulder, who is in the U. S. Navy and lives in Indiana, Talmage Whitaker and a girl arrived in an automobile at defendant's place of business, which is situate about four miles north of the town of Sparta on U. S. Highway 21. Defendant and his wife were there. Reeves and Moulder went into defendant's place of business: Talmage Whitaker and the girl remained in the automobile. Talmage Whitaker came in later. The girl remained in the automobile. While there, Reeves drank some whisky and beer. He got the whisky from the defendant. It was bootleg liquor, and was in the storage room. Moulder drank some beer there. As one enters defendant's place of business there is a big room about 25 x 50 feet. At the end of this room on the left is a storage room about 10 x 25 feet.

Reeves heard Whitaker say, "lets go back and get a drink." Defendant and Talmage Whitaker went into the storage room. Reeves testified as follows: "When Talmage and Mack went into the storeroom, they closed the door and I was sitting between the juke box

and the stove and had been drinking some. There were some chairs around the stove and Morris and Mrs. Atwood and I were there and I went to sleep. The next thing I remember is when Morris got me awake and I turned around and Talmage was lying on the floor behind me. Someone said Talmage had been shot and I went over and looked at Talmage and kicked him kind of on the leg and told him to wake up. I thought he was asleep. Mack said to me, 'Leave him alone; he has been shot.' I was standing over Talmage and Mack brought a pistol in and Mack stuck the butt of it in Talmage's left hand and said, 'This is the way he had it.' Mack took the pistol and stuck Talmage's hand in there and pushed his hand upon it and took it away. Shortly thereafter the ambulance came and I went to the hospital."

Moulder testified as follows: "I went to sleep sitting around the stove. Mack woke me up when he hollered to his wife that 'Talmage shot himself with that old gun.' We were standing around the stove. Mack hollered about three times that Talmage shot himself fooling with that old gun. I woke up and got up out of my chair. He went into the back room and when he came out he had Talmage, dragging him, and he dragged him in and laid him down. Mack had his arms under Talmage's arms and his feet were dragging the floor. He drug him from the back room and laid him down in the big room. Then Mack brought the gun out. I do not remember whether it was in the back room or whether he had it on him or what, but I saw him put the gun in Talmage's hand and wiggle it around and said, 'That is the way he had the gun.' The gun was put in Talmage's left hand. I saw Mack walk behind the counter and I do not know whether he laid the gun up there or what. I did not see the gun any more."

Talmage Whitaker's thumb on his left hand was off to about the first joint; his two middle fingers on the same hand were off down to the second joints; and his little finger on the same hand was stiff. His left hand had been in that condition since he was 12 years old. It was caused by a dynamite cap. He was right-handed. He was five feet, six or seven inches tall, and weighed 140 pounds.

Sheriff Dent Pugh arrived at the hospital about 3:30 a. m. on 2 February 1958. Talmage Whitaker was dead. He talked there with the defendant. He smelt the odor of alcohol on defendant's breath, and, in his opinion, he was under its influence. This in substance is what defendant said to Sheriff Pugh at the hospital: Whitaker asked him to go into the back room. They did. Whitaker asked to see his pistol. He handed him his pistol, and told him to be careful, it was loaded. He walked over to the other side of the back room, and had his back

turned to Whitaker. He heard the pistol fire. He looked around, and Whitaker had fallen among the empty cases. Whitaker was holding the pistol in his right hand. He took it out of his hand, and laid it on the floor. He called an ambulance, and carried Whitaker to the hospital. About 6:00 a. m. on the same day Sheriff Pugh and Melvin Crawford, a special agent of the State Bureau of Investigation, went to defendant's home, waked him, and they went to defendant's place of business. The pistol was lying on the floor in the back storage room. The defendant said then that he took the pistol out of Whitaker's hand, and laid it on the floor, and that he hadn't moved it before we picked it up. That he gave Whitaker a drink of nontax-paid whisky, and he walked over to the stairway leading upstairs to get a drink of red liquor that he had stuck down by the stairway, and then the pistol fired. That he was several feet away, when the pistol fired. That he got Whitaker under the arms, and dragged him into the front room. Sheriff Pugh testified he had subpoenaed Talmage Whitaker as a witness against defendant in a hit and run case.

Melvin Crawford picked up the pistol, wrapped it in a handkerchief, carried it to Raleigh, and turned it over to special agent Haywood R. Starling at the State Bureau of Investigation Laboratory. He was present when Starling tested the pistol for fingerprints. Crawford took fingerprints from Talmage Whitaker's hands, which were put on a card. The pistol had in the chamber five unfired bullets and one fired shell. He got Talmage Whitaker's clothes from a stretcher at the undertakers, put them in a bag, and carried them to Raleigh.

The trial court found as a fact that Haywood R. Starling was an expert on fingerprint identification. He testified in substance: He examined this pistol on 3 February 1958, and found fingerprints on it on the frame just below the cylinder release. The fingerprint represents the right thumb. The end of the thumb in that fingerprint was pointing directly upward toward the cylinder release. It was directly behind and below the cylinder. He made a comparison of this fingerprint, a right thumb fingerprint, with the right thumb print on the fingerprint card he received from Melvin Crawford, bearing the identification "fingerprints of Talmage Whitaker." In his opinion, the right thumb fingerprint on the pistol is identical with the right thumb fingerprint on the card he received from Melvin Crawford, bearing for identification "fingerprints of Talmage Whitaker."

On 3 February 1958 Dr. Gayle Jackson Ashley performed an autopsy on the body of Talmage Whitaker to determine the path of the bullet through his body. The bullet entered the front of the chest just below the left nipple, and went through the body at an angle of about

10 degrees upward and 25 degrees toward the middle portion, or midline, of the body. There was a small wound on the anterior chest wall, about three-eights of an inch in diameter. There was another wound on the back of the left chest cage approximately one-fourth of an inch in diameter. He testified in detail as to the angle and course of the bullet through the body, using a pencil to illustrate his testimony. In response to a question asked by the State, Dr. Ashley was permitted, over an objection and exception by the defendant, to stand up and point the pistol at his body at the angle which the bullet wound penetrated Talmage Whitaker's body. The court in overruling the objection by defendant instructed the jury that they could only consider this demonstration as it may illustrate Dr. Ashley's testimony, and could not consider it as substantive evidence. Over objections and exceptions by the defendant, Dr. Ashley was permitted to testify that it wasn't a very convenient angle to pull the trigger with his right hand, and that it was physically difficult to get his arms in a position to demonstrate the angle of the wound with that pistol. The Record shows later on that the trial court, without any objection on defendant's part, permitted the jury to examine the pistol in any manner they desired to do. Dr. Ashley further testified that he did not obtain sufficient information to enable him to give an opinion as to the distance the pistol was from the body at the time the bullet was fired.

Defendant's assignments of error to the demonstration by Dr. Ashley to illustrate his testimony, and to his testimony as to the angle of the pistol set forth above are overruled. *S. v. Powell*, 238 N.C. 527, 78 S.E. 2d 248, and cases cited therein; *People v. Willis*, (Cal. App.), 233 P. 812. The California case was a prosecution for murder. The Court held admissible in evidence an expert's testimony as to operation of gun used by defendant, and difficulty of pulling trigger while holding it in position from which defendant was alleged to have fired. "A witness may use his own body, or a member of his body, or an article, to illustrate or explain the evidence." 32 C.J.S., Evidence, Sec. 603. *S. v. Carr*, 196 N.C. 129, 144 S.E. 698, relied on by defendant, is factually distinguishable. In that case the issue was whether the deceased committed suicide or was killed by the defendant. A new trial was awarded because medical expert testimony was erroneously admitted to the effect that it was not possible for deceased to have fired the gun, and made the wound the expert saw, which was the very issue the jury had to decide.

John Boyd, a special agent of the State Bureau of Investigation, does firearms identification work, and is assigned to the ballistics laboratory. He holds a degree from North Carolina State College,

which includes extensive training in microscopy. He has received specialized technical training in the field of firearms identification and in different types of weapons in five different manufacturing plants. He has received technical training in the H. P. White Technical Laboratories in Bel Air, Maryland. He has made 500 or 600 ballistics tests in the last six years. In the last six years he has testified about 100 times as an expert in the field of ballistics in the State and Federal Courts. Without any objection on the part of defendant, the trial court found that he was an expert in the field of ballistics. He testified in substance: The field of ballistics includes, among other things, powder and shot concentration or shot patterns, and making chemical tests for nitrates and gun powder. He examined Talmage Whitaker's jacket, which he got from special agent Melvin Crawford. The jacket had a stain on the front left upper portion and a point of penetration at this point. From a visual inspection the stain was believed to be blood. A standard nitrate test made on the area around the hole in the jacket for the purpose of determining if there were any burned or unburned particles or powder residue around this area of the jacket showed the powder residue at that point on the jacket was only negligible. He also ran a nitrate test on Talmage Whitaker's sweat shirt and undershirt, which revealed only a negligible amount of nitrates. The nitrate test is for gunpowder residue. In Sparta about 3 February 1958 he saw Dr. Gayle Jackson Ashley remove from Talmage Whitaker's body some skin tissue from the point of penetration of the wound and the left chest. He saw William Best, chemist of the State Bureau of Investivation, make a chemical test to determine whether or not those portions of skin tissue contained burned or unburned powder particles or powder residue. The test was negative. He fired the Smith & Wesson pistol belonging to defendant, and which pistol was the death weapon, into white blotter paper to try to duplicate the nitrate tests on Talmage Whitaker's garments that he tested. This weapon was fired in contact with the blotter paper, and was backed away from the paper periodically at definite intervals until a distance of 40 inches was reached. In doing this he used 9 or 10 pieces of this paper. Powder residue and partially burned and unburned powder particles were noted at every point back to 40 inches. There was only a negligible amount of nitrate at 40 inches. This very favorably compares at 40 inches to the nitrate tests which were conducted on Talmage Whitaker's garments. He used the same type of ammunition as was found discharged in the cylinder of the pistol. He used these pieces of paper to illustrate his testimony. He used white blotter paper so as to give a contrast between the black unburned and burned

powder particles and powder residue and the white background of the paper. From his examination of Talmage Whitaker's clothing, of the skin tissue taken from his body, and of the pistol, he has an opinion satisfactory to himself that the pistol was fired at a distance of 40 inches or more from Talmage Whitaker's body. If this Smith & Wesson pistol were fired in contact with a human body, the wound of entry would be a large gaping hole due to the fact that the force of the gas pressure forcing the bullet down the barrel must be allowed to escape in the body down the wound of entry. That force blows a large hole in the human body. Whereas, if the pistol were fired at a distance, the only force the human body would receive is that of the impact of the striking of the bullet. The hole that this pistol would impart to a body fired at a distance would be a hole approximately the size of the bullet. He observed the wound on the front of Talmage Whitaker's body. In his opinion, the size of the wound of entry did not indicate a contact shot. On a contact shot it would be practically impossible to remove all of the nitrates from the clothing regardless of how they are handled. It would nearly be impossible to remove them other than by washing them, because the nitrates, the burned and unburned powder particles are imbedded into the fabric. They are not just gently laid on it. They are thrown there by terrific force. A shot that was fired at some distance, part of the nitrates would still be imbedded in the fabric from the force that pushed them there. You could not remove them all.

Defendant assigns as error the admission in evidence, over his objection and exception, of the testimony of John Boyd that, in his opinion, the pistol was fired at a distance of 40 inches or more from Talmage Whitaker's body, and that, in his opinion, the size of the wound of entry did not indicate a contact shot. *S. v. Fox,* 197 N.C. 478, 149 S.E. 735, was a prosecution for murder. A doctor, admitted to be a medical expert, examined the body of Jesse Taylor, the man killed. He was asked this question by the State: "Have you an opinion satisfactory to yourself on this question, as to whether or not Jesse Taylor, the wound which was found in his neck, was inflicted while he was lying or standing up?" "Answer: "Yes, sir my opinion is that he was lying down." This Court held the testimony competent, as clearly within the domain of expert testimony. In *S. v. Stanley,* 227 N.C. 650, 44 S.E. 2d 196, a physician testified that, in his opinion, deceased was lying on the floor when fatal injuries inflicted; in *McManus v. R. R.,* 174 N.C. 735, 94 S.E. 455, a physician testified the intestate, in his opinion, was lying down at time of injury; in *George v. R. R.,* 215 N.C. 773, 3 S.E. 2d 286, there is similar testi-

mony as in the *McManus* case. In *S. v. Powell, supra,* a medical expert testified as to the bullet wounds in, and powder burns on the head and hand of deceased. This Court held that it was competent for him to testify from his examination of the body as to the position of deceased's hand when the fatal shot was fired. John Boyd is an expert witness on ballistics. He saw and tested the deceased's garments, and saw the wound on the front of Talmage Whitaker's chest—the point of entry of the bullet. The opinions he expressed are clearly competent as within the realm of expert testimony. The above assignments of error, and defendant's assignment of error Number 8 related thereto, are overruled.

Defendant's assignment of error Number 3 is that the court erred in permitting John Boyd to testify, over his objection and exception, as to the tests he made in firing the death pistol, with similar ammunition to the empty shell in the chamber of the pistol, into white blotting paper. This assignment of error is overruled.

*S. v. Phillips,* 228 N.C. 595, 46 S.E. 2d 720, was a prosecution for murder. The Court stated: "The State contended on the second trial, as well as on the first, that the range of the death bullet plus the absence of powder burns left the theory of suicide with no substantial basis of fact. In support of this contention, the prosecution had experiments made to determine whether bullets fired from the death pistol at close range would show powder burns on the targets. They did. On cross-examination, one of the officers who made the experiments stated that 'the amount of powder in a shell and the type of powder would have right much to do with discoloration, but it would have nothing to do with what we call powder burns. These are powder burns. That is what I am talking about.' . . . While the experimental conditions here were not identical with those attending the matter under review, still they were sufficiently similar for the experimental results to throw light upon the controversy and to assist the jury in making true deliverance in the case, 20 Am. Jur., 628. Hence, the ruling of the court in admitting the evidence will be sustained." The targets were white cheese cloth.

*Thrawley v. State,* 153 Ind. 375, 55 N.E. 95, was a prosecution for homicide. Defendant contended there was a hand to hand combat. The prosecution adduced evidence to show deceased had been shot from a distance. The Court held it was competent to permit a witness for the State to testify to the results of experiments in shooting with defendant's revolver at blotting pads for the purpose of showing how far unburned grains of powder would carry, the same make and grade of cartridges being used as defendant had employed in the homicide,

and it appearing that the cartridges are standard and uniform in operation. In *Newkirk v. State,* 134 Md. 310, 106 A. 694, experiments made with the same revolver and the remaining ammunition contained therein by shooting at a light cloth, for the purpose of determining the distance at which the revolver must have been held to produce the burned effect upon the clothing of a woman, were held admissible upon the question whether she was murdered or committed suicide.

In *Shepherd v. State,* (Oklahoma), 300 P. 421, the State's evidence disclosed that there were no powder burns on the body, nor on the shirt worn by deceased at time he was shot. The theory of the defense was that the shooting was accidental. The State offered the following evidence to show the pistol was farther from the deceased at the time it was discharged than the defense claimed: Two police officers testified they placed shirting material on the side of a box and fired at it at a distance of 6, 15, 24 and 36 inches, and the results of such shots as showing powder burns. The Court said: "We are satisfied that the court did not err in admitting evidence of the experiments as tending to shed some light on the firing of the fatal shot, and its weight was for the jury to determine." To the same effect see: *Sullivan v. Commonwealth,* 93 Pa. St. 284; *People v. Clark,* 84 Cal. 573, 24 P. 313; *Irby v. State,* (Okla. Crim. App.), 197 P. 526; *Wynes v. State,* 182 Ga. 434, 185 S.E. 711.

John Boyd testified that he fired the pistol into a piece of pork or fatback. The pork was in court. It was offered in evidence without objection. The prosecuting officer asked him to cut the pork open. The defendant objected. The objection was sustained. Beneath in the Record appears Exception 10. This is all in the Record in respect to the pork. Before the State concluded its case, the court instructed the jury: "The court at this time will exclude Exhibit No. S-9, which is the piece of fatback meat that was introduced into evidence and the court will instruct you, lady and gentlemen of the jury, that you won't consider that exhibit, State's Exhibit No. 9, the piece of fatback meat in any way in this case, and you won't consider any evidence relating to that exhibit." Defendant's assignment of error, based on Exception 10, is overruled.

The other assignments of error as to the evidence have been carefully examined, and are all overruled.

The State offered in evidence the statements of defendant as to the firing of the pistol in the hands of deceased, but that does not prevent the State from showing that the facts were different. *S. v. Phelps,* 242 N.C. 540, 89 S.E. 2d 132; *S. v. Simmons,* 240 N.C. 780, 83 S.E. 2d 904.

In our opinion, the evidence introduced by the State, when considered in the light most favorable to the State, is of sufficient probative force to justify the jury in drawing the inference that the defendant shot the deceased with his pistol, and is guilty of murder in the second degree. The assignment of error to the refusal of the court to nonsuit the case at the close of all the evidence is overruled.

There are no assignments of error to the charge.

In the trial below we find

No Error.

HIGGINS, J., took no part in the consideration or decision of this case.