STATE OF NORTH CAROLINA v. DWIGHT BENJAMIN

No. 863SC469

(Filed 18 November 1986)

**1. Homicide § 15.4; Criminal Law § 57— firearm tests—expert's opinion admissible**

In a prosecution of defendant for involuntary manslaughter where the evidence tended to show that the victim died from a gunshot wound to the head, the trial court did not err in allowing an SBI lab technician who had performed "many thousands" of gunshot residue tests to testify that the accumulation of residue on the victim's hands was inconsistent with his having recently fired defendant's revolver, to testify how the residue could have gotten there, and to testify concerning his opinion that the failure of defendant's residue test to provide conclusive results could have been caused by the passage of three and one-half hours since the time of the shooting and by activity on the part of defendant during that period. N.C.G.S. § 8C-1, Rule 702.

**2. Criminal Law § 57— use of weapon—demonstration proper**

The trial court in an involuntary manslaughter prosecution did not err in allowing the medical examiner to demonstrate with the use of a .357 magnum that he, a man approximately the size of the victim, could not shoot himself in the head with the gun from the necessary distance of from 22 to 26 inches.

**3. Homicide § 21.9— shooting death—involuntary manslaughter—sufficiency of evidence**

Evidence was sufficient to be submitted to the jury in a prosecution for involuntary manslaughter where it tended to show that defendant and the victim were alone in defendant's apartment drinking gin and watching TV when defendant brought out his .357 magnum to show the victim; the weapon was a single and double action revolver; four pounds of pressure were necessary to fire it single action and eleven pounds to fire it double action; an expert witness testified that the victim could not have shot himself with the firearm from the necessary distance; after the shooting the defendant continued to state "[i]t is only a game, it is only a game, he didn't know the gun was loaded"; and a forensic chemist testified that the concentrations of gunshot residue on the victim's hands were inconsistent with the victim's having fired defendant's gun recently and were more consistent with his having held his hand in a defensive position between the gun and his face.

APPEAL by defendant from *Pope, Judge.* Judgment entered 24 January 1986 in Superior Court, CRAVEN County. Heard in the Court of Appeals 17 September 1986.

The defendant was charged in a proper bill of indictment with the 5 April 1985 murder of Seth Albert Wright. At trial the State presented evidence tending to show the following: Before 5

April 1985 the defendant and the victim, both Marines stationed at Cherry Point, North Carolina, were friends for several months. On the morning of 5 April the two men worked on the victim's car at the defendant's home. The victim brought a bottle of gin which the men later drank while watching television in the defendant's apartment. The defendant then brought out his .357 magnum revolver to show the victim. According to his statement to police, the defendant unloaded the gun, placed the bullets on the kitchen table and handed the gun to the victim. The victim and the defendant were sitting at opposite ends of the kitchen table. The defendant stated that he heard a loud noise and turned to see the victim lying on the floor with a gunshot wound to his head. The defendant then removed the spent shell and threw it out the back door. The defendant's neighbors called the police and rescue squad. A rescue squad member and Captain C. K. McKenzie both testified that the defendant repeatedly said, "[i]t's only a game, it's only a game, he didn't know the gun was loaded."

Dr. Charles Garrett, who performed the autopsy, testified that based upon various tests, in his opinion the gun was fired from a distance of between 22 and 26 inches from the victim's left temple. He also testified that in his opinion the victim could not have shot himself from that distance. Wipings taken from the victim's hands showed concentrations of gunshot residue too great to be consistent with the victim having fired the fatal shot. Wipings taken from the defendant's hands yielded inconclusive results. The State also presented evidence that while riding in a police patrol car the defendant stated "[w]hat if I tell you the truth about what happened? . . . Well, if I tell you the truth, I'll go to jail for sure then."

The defendant presented no evidence at trial. He was found guilty of involuntary manslaughter and from a judgment imposing a prison sentence of thirty months, he appealed.

*Attorney General Lacy H. Thornburg, by Special Deputy Attorney General James B. Richmond, for the State.*

*John H. Harmon for defendant appellant.*

WEBB, Judge.

[1] By his first assignment the defendant argues that the trial court committed reversible error by permitting a State Bureau of

Investigation laboratory technician to testify that the high level of gunshot residue found on the victim's hands could have been caused by the victim's bringing his hand up between his body and the gun in a defensive posture. He argues that this testimony was inadmissible because the SBI technician's "opinions were mere speculation and amounted to allowing the State's witness to impeach his own test results." We cannot agree.

G.S. 8C-1, Rule 702 states:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion.

The SBI technician in this case, who had performed "many thousands" of gunshot residue tests prior to trial, was accepted by the court as an expert in the field of forensic chemistry. He testified that in his opinion the accumulation of gunshot residue on the victim's hands was inconsistent with his having recently fired the defendant's .357 magnum revolver. Under these circumstances, the witness' opinion as to how the victim could have gotten this residue on his hands would assist the trier of fact to determine a fact in issue, whether the victim had intentionally or accidentally shot himself or whether he had been shot by the defendant.

The defendant also argues that the same witness was improperly permitted to testify concerning his opinion that the failure of the defendant's gunshot residue tests to provide conclusive results could have been caused by the passage of three and a half hours since the time of the shooting and by activity on the part of the defendant during that period. Again, we disagree. The witness testified that although there was gunshot residue on the defendant's left hand, the residue concentrations were not significant enough or consistent enough with the results of controlled tests to permit him to form an opinion of whether the defendant had recently fired his revolver. He then offered his opinion of what circumstances could affect these tests and lead to inconclusive results. We believe this testimony was properly admitted to assist the jury in understanding the inconclusive results of the defendant's gunshot residue tests.

State v. Benjamin

[2]  The defendant next assigns as error the court's permitting Dr. Garrett, the medical examiner, to demonstrate with the use of the .357 magnum that he, a man approximately the size of the victim, could not shoot himself in the head with the gun from the necessary distance of from 22 to 26 inches. The defendant argues that this demonstration should have been excluded because no foundation was laid that the conditions at the time of the demonstration were substantially similar to those existing at the time of the shooting. This question is controlled by *State v. Atwood*, 250 N.C. 141, 108 S.E. 2d 219 (1959) in which our Supreme Court, in a murder prosecution, held that an expert witness who had performed the autopsy upon the victim was properly permitted to demonstrate for the jury the difficulty which the victim would have encountered in attempting to shoot himself from the distance and at the angle from which the fatal shot was fired. This assignment of error is without merit.

[3]  Finally, the defendant argues that the court erred in denying his motion to dismiss because there is insufficient evidence, as a matter of law, to show that the victim died from a gunshot fired by the defendant. Again, we disagree.

Involuntary manslaughter is the unlawful and unintentional killing of a human being without malice and which proximately results from the commission of an unlawful act not amounting to a felony or not naturally dangerous to human life, or from the commission of some act done in an unlawful or culpably negligent manner, or from the culpable omission to perform some legal duty. *State v. Everhart*, 291 N.C. 700, 231 S.E. 2d 604 (1977). "One who handles a firearm in a reckless or wanton manner and thereby unintentionally causes the death of another is guilty of involuntary manslaughter." *State v. Moore*, 275 N.C. 198, 212, 166 S.E. 2d 652, 662 (1969).

The evidence in this case tends to show that the defendant and the victim were alone in the defendant's apartment drinking gin and watching television when the defendant brought out his .357 magnum to show the victim. The weapon was a single and double action revolver. To fire it single action, it is necessary to exert four pounds of pressure upon the trigger. To fire it double action, one must apply eleven pounds of pressure. An expert witness testified that the victim could not have shot himself with

this firearm from the necessary distance. After the shooting the defendant continued to state "[i]t is only a game, it is only a game, he didn't know the gun was loaded." Finally, a forensic chemist testified that the concentrations of gunshot residue on the victim's hands were inconsistent with the victim's having fired the defendant's gun recently and were more consistent with his having held his hand in a defensive position between the gun and his face. We believe this evidence is sufficient to permit a reasonable jury to conclude that the victim died as a result of the defendant's culpably negligent handling of a loaded firearm.

The defendant, relying upon *State v. Hood*, 77 N.C. App. 170, 334 S.E. 2d 421, *review denied, writ denied*, 314 N.C. 671, 335 S.E. 2d 900 (1985), argues that the evidence is insufficient to support this conviction. The evidence in *Hood* tended to show that the victim was found dead from a gunshot wound. Sometime in the morning of the day the victim died his neighbor heard a car drive up, heard a man's voice calling the victim's name, and then heard a gunshot. Ten minutes later the neighbor saw the defendant driving away from the area of the victim's home. The victim's warm body was discovered at 8:30 p.m. that evening. The medical examiner was unable to estimate the time of death. Our Supreme Court held this evidence insufficient to support a homicide conviction. We believe *State v. Hood* is clearly distinguishable from the present case on the ground that in *Hood* there was no evidence placing the defendant at the site of the shooting at the time it took place, so that the State had failed to show that the defendant had an opportunity to commit the murder. In the present case all the evidence established that the defendant and the victim were alone in the defendant's home at the time of the shooting. In *Hood* the Court also held that evidence that the victim was killed by a .25 caliber bullet and that no .25 caliber pistol was found anywhere in the vicinity of the body, combined with evidence that four people were known to have been at the shooting site and could have removed a suicide weapon "directs the conclusion that the State failed to show that a crime had been committed." *Id.* at 172, 334 S.E. 2d at 422. In the present case there is evidence showing that the victim could not have fired the fatal shot. The trial court properly denied the defendant's motion to dismiss.

No error.

Judges BECTON and EAGLES concur.