THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* RUTHE CARBONA, Defendant-Appellant.

(No. 59299;

First District (1st Division)—April 7, 1975.

*Rehearing denied May 15, 1975.*

990

Julius Lucius Echeles and Carolyn Jaffe, both of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Patrick T. Driscoll, Jr., and Barry Rand Elden, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE BURKE delivered the opinion of the court:

Defendant Ruthe Carbona was indicted and tried for the murder of her husband, Joseph Carbona. (Ill. Rev. Stat. 1969, ch. 38, par. 9—1.) A jury found defendant guilty and she was sentenced to a term of 20 to 60 years' imprisonment. Twelve issues are raised by defendant on appeal.

Defendant contends: (1) that her *Miranda* rights were violated; (2) that it was error to admit improper expert testimony; (3) that it was error to admit ballistics evidence which differed substantially from actual conditions; (4) that the use of an incomplete diagram of the scene was prejudicial; (5) that the presentation of improper rebuttal evidence warrants reversal; (6) that she was entitled to allowance of a motion for acquittal after the State's case in chief; (7) that it was error to allow a former assistant State's attorney to testify to his recommendation that murder charges be lodged against defendant; (8) that it was prejudicial to inform the jury of defendant's unwillingness to give a homicide statement in the exercise of her right to remain silent; (9) that the prosecutor conducted himself improperly during defendant's cross-examination and during closing argument; (10) that the jury was improperly interrogated about publicity concerning the trial; (11) that the jury was improperly instructed; and (12) that the evidence failed to prove defendant guilty beyond a reasonable doubt. We will state the pertinent facts and first consider the question of the sufficiency of evidence.

On December 22, 1971, at approximately 9:25 A.M., Officer Robert Buckley responded to an emergency call over the police radio which directed any patrolling car to proceed to the home of Lieutenant Joseph Carbona, 1206 Euclid, Mount Prospect. Buckley was the first of several police officers to arrive at the scene. Upon the hysterical pleas of the defendant, Buckley entered the front door of the home. The deceased, Lieutenant Carbona, was lying on the foyer floor face up with his feet propped two steps up on the landing of a staircase leading to the second floor of the house. The lieutenant was fully clothed, wearing a brown corduroy carcoat, a blue nylon windbreaker underneath, a blue under-

shirt, and blue trousers. Buckley observed blood on the deceased's chest and found a wound in the chest area of the body. The deceased's eyes were half open and the chest wound had apparently stopped bleeding. Buckley asked the defendant what happened, and she replied, "I don't know. We had a fight." Buckley could not find any signs of life, but immediately called an ambulance for medical assistance. Buckley observed a .357 magnum revolver on the fourth stair. He did not observe or smell any signs of gun powder, nor did he notice any bruises or marks on the face of the defendant. During cross-examination, Buckley testified that he thought Lieutenant Carbona was dead.

Donald Shaw was the next officer to arrive at the Carbona home. He grabbed his first-aid kit and ran towards the front door. Defendant screamed, "Hurry Don, hurry; Joe has been hurt." Shaw checked for vital signs but found none. He observed that the deceased's eyes were open and beginning to dry, and that the wound in the chest had stopped bleeding. The defendant appeared to be in an hysterical state, screaming, "Help him, Don; help him, Don. He wanted to hurt me, and Joe got hurt. Tell me he is all right." A black jacket, neckties, and trousers were found scattered on the landing by Lieutenant Carbona's feet. Further investigation revealed a bullet hole in the back of the deceased considerably higher than the wound in the chest. A bullet was recovered from the lining of the brown corduroy carcoat.

Shaw testified that his assignment was to accompany the ambulance which transported Lieutenant Carbona's body to Holy Family Hospital. The deceased was taken to the emergency room at 11:30 A.M. and pronounced dead on arrival. The body was removed to the hospital's morgue facility. Shaw and Investigator William Denaer undressed and processed the body. Photographs were taken and the deceased's clothing was placed in plastic bags. Shaw tagged the body for purposes of identification.

On cross-examination Shaw testified that he did not observe any marks or bruises on the defendant. However, he did notice bruises on the knuckles and wrists of the deceased. Shaw stated that it was his opinion, based upon his training and experience as a police officer, that the back wound exhibited characteristics of an entrance wound. He observed a halo surrounding the perimeter of the back wound which generally indicates a bruising effect caused by the bullet entering the body at that point.

Investigator William Denaer corroborated the testimony of Officer Shaw. Denaer identified in court every item of clothing removed from Lieutenant Carbona at the morgue, explaining the manner in which each item was identified and bagged. He also stated that he photographed the scene with color and black and white film. The trial court

excluded the color prints from evidence because of their possible inflammatory effect; however, a few black and white photographs were later admitted as instructional aids for the jury.

Gary Nelson, a mortician from the Oehler Funeral Home, arrived at the Carbona home with an assistant at approximately 10:30 A.M. Pursuant to the instructions of police officers, Nelson and his assistant lifted the deceased's body inside a basket-type canvas cot. Nelson testified that at no time was the body dragged. After Nelson transported the deceased to the hospital, the body was not removed from the cot until it was lifted onto the autopsy table in the hospital morgue. Nelson assisted Officers Shaw and Denaer in undressing the body.

Sergeant Ernest Marinelli arrived on the scene at approximately 9:30 A.M. Officer Buckley informed Marinelli that the defendant had been arguing with her husband, Lieutenant Carbona, and that the Lieutenant had been shot. Defendant was taken to a neighbor's home accompanied by her mother, brother and sister. Marinelli, who was known by the defendant through her previous associations with the Sheriff's Police Department, approached the defendant in the neighbor's home and asked, "What happened?" Defendant told Marinelli that the deceased had the gun in his hand while he was descending the stairs. In an attempt to dissuade the deceased from leaving her, defendant pulled at the arm of the deceased which held the gun. The deceased tripped, discharging the gun, and he fell to the landing of the staircase. The record is clear that Marinelli's police report of December 22, 1971, accurately recounted his interview with the defendant at the neighbor's home. The record is also clear that defense counsel had knowledge of defendant's statement.

The court heard Marinelli's testimony regarding defendant's initial statement in *voir dire* outside the presence of the jury. The court excluded the statement holding that *Miranda* warnings should have been given since defendant was the focus of interrogation.

Marinelli further testified that he collected evidence in the Carbona home. A bullet was recovered from the inner lining of the Lieutenant's brown corduroy carcoat. A .38 snub-nose revolver loaded with six unspent shells was found in one of the pockets of the carcoat. The .357 magnum, which was found on the fourth step, contained three live cartridges and one spent cartridge. The Lieutenant's dark Lincoln Continental automobile was parked in the driveway and contained items of clothing and books. The deceased's eyes were drying. Marinelli believed that Lieutenant Carbona was dead. Marinelli did not smell any alcohol around the deceased's body. When Marinelli returned to the police station at approximately 11 A.M., he found the defendant in the Commander's office with a policewoman on the third floor of the station.

Marinelli testified that he advised defendant of her constitutional rights with the proper warnings. Defendant indicated that she understood those warnings by shaking her head yes. She was crying, but not hysterical. Defendant told Marinelli that she met her husband at her place of employment on the previous evening. He followed the defendant home in his own car. Defendant said that once they were at home, the Lieutenant attempted to run her over with his car. The defendant's leg had been struck, but she told Marinelli that a doctor was not needed.

Defendant related to Marinelli that an argument ensued which awoke the defendant's two children. The deceased left the home at about 3 A.M. but later returned at about 6 A.M. The deceased intended to remove his personal belongings and leave. After much argument, the Lieutenant struck the defendant on the head and threatened to kill her. Once he started to walk downstairs, the defendant grabbed his arm. After a struggle, the deceased tripped, discharging the gun. Defendant told Marinelli that she couldn't recall if it was he or she who fired the weapon, or if it was in her hand or his hand when the gun discharged. Defendant claimed that she immediately called the police.

Marinelli offered his testimony concerning the defendant's statement at the police station before trial began. After hearing the testimony, the trial court denied defendant's preliminary motion to suppress finding that there was no evidence of pressure or coercion placed upon the defendant. Defendant's statement to Marinelli at the police station was allowed to go before the jury.

Detective Bernard Singer arrived at the scene at approximately 9:45 A.M. Singer has been a policeman for over 20 years. He examined the body and believed that the Lieutenant was dead. There were no observable "black marks" or "powder burns" on the body of the deceased. Singer found a pellet in the deceased's carcoat lining which approximated a .38-caliber bullet. Singer also found the .38 snub-nose revolver in one of the carcoat's pockets. Singer testified that a fingerprint analysis of the .357 magnum revolver was conducted at the police laboratory. No fingerprints were found suitable for comparison. Subsequent to Detective Singer's testimony, the State introduced pieces of fiber which adhered to the bullet found on the deceased's body. Those fibers matched the material of the blue nylon jacket which was worn by the deceased underneath the brown corduroy carcoat.

Ballistics evidence was introduced by Bert Nielson, a fire-arm identification technician with 12 years' experience. He testified that the .357 magnum revolver found at the scene could not be fired without pulling the trigger to the rearward position. The .38-caliber bullet found in the deceased's carcoat was of the type used in the .357 magnum revolver and

had the same "class characteristics" (six lands and grooves, spiral to the left) as the .357 magnum gun. There was no indication on the bullet itself that it had ricocheted off a harder substance before entering the deceased's body.

Powder pattern tests were performed by Nielson. He used the same .357 magnum revolver with the same type of ammunition from the same manufacturer as the spent cartridge found in the revolver. The gun was fired at padded pieces of cotton in order to determine what kind of powder residue remained at certain firing distances. Nielson claimed that all powders, even fast-burning ones, will leave a residue.

A microscopic analysis was conducted on the cotton used in Nielson's powder pattern tests by Louis A. Vitullo, who has 21 years' experience as a microanalyst with the Chicago Police Department Laboratory. When the revolver was fired directly in contact with cotton material, the exterior became jaggedly torn; the interior contained deposits of tattooed powder with much of the powder embedded deeper into the fiber. Scorching, burning of fiber, and smudging of soot was also evident. When the gun was held 6 inches from the cotton cloth, there was smudging from the soot of the propellant, light scorching and tattooing of unburnt or partially burnt particles of powder. When the revolver was held 12 inches, 18 inches, 24 inches and 30 inches from the cotton target, both smudging and tattooing occurred. From a distance of 36 inches and 48 inches, only tattooing of the unburnt and partially burnt particles of powder was evident.

Vitullo also examined the rear panel of the brown corduroy carcoat of the deceased under both regular and infrared light. Photographs were taken of these microscopic tests. There was no indication on the corduroy of scorching, burning, smudging or tattooing of unburnt or partially burnt particles of powder; there were no particles of steel jacketing from a bullet present. The periphery of the bullet hole did not evidence burnt powder deposits. Neither was there any powder residue on the blue nylon jacket or on the tee shirt which was worn underneath the carcoat. An examination of the plastic bag which the police used to transport the carcoat from the scene of the death to the laboratory revealed no particles of powder or foreign substance due to shaking. Vitullo stated that even when an article of clothing containing powder particles is vacuumed, 100 percent of the particles cannot be removed. Although blood will discolor powder particles, infrared light would disclose the particles under microscopic examination. Corduroy, Vitullo testified, is a form of cotton.

Dr. Edward Shalgos, a pathologist with 35 years' experience, performed an autopsy on the body of Lieutenant Carbona during the morn-

ing of December 23, 1971, the day after the Lieutenant's death. Dr. Shalgos testified that he identified the body as Lieutenant Carbona's because of the identification tags attached to the body and the referral sheet corresponding to the tags. Two bullet wounds were found. The back wound was approximately midlevel and 1½ inches to the left of the midline. The back wound was 5 inches higher in position than the front wound, indicating a sharp, downward direction of the bullet path. Although the front wound was described by Dr. Shalgos in the preliminary stages of his report as having entry characteristics, further investigation revealed that the front wound was the exit wound. Fibers of clothing were found embedded in the back wound. Solid tissues of cartilage were pushed outward. These and other findings revealed that the cause of death was that a bullet entered the deceased's back and lacerated his lung, aorta, and heart. The body had to be turned slightly to the right to explain the slightly rightward course of the bullet path.

Based upon his examination of the entire body, Dr. Shalgos was asked on direct if he had formed an opinion, based upon a reasonable degree of medical certainty, as to whether or not Joseph Carbona's arms could have been in a position to inflict the wounds which caused his death. Over objection by defense counsel, Dr. Shalgos testified that it was his opinion that it was a physical impossibility for the deceased to have shot himself.

The defense initiated its case with the testimony of James Lindmark, a former assistant State's attorney of Cook County. Lindmark stated that on December 22, 1971, he was sent to the Sheriff's station where defendant was being held for the purpose of obtaining a homicide statement. Lindmark found the defendant, her mother and a policewoman together in the station. Defendant was crying. Lindmark, at the request of defendant's mother, telephoned defense counsel. Lindmark observed bruises and skin discoloration on defendant's face. Apprehensive that the bruises were received at the police station, Lindmark told defendant that he would just as soon prosecute a policeman if she received those bruises from anybody at the station as prosecute her. When asked about the bruises, defendant told Lindmark that she received them from her husband, the deceased. The defendant did not request the assistance of a physician.

At the outset of cross-examination by the State, the trial court admonished Lindmark not to state that defense counsel had advised defendant to refrain from volunteering information without his presence. Subsequent to the court's ruling, an objection by defense counsel was sustained as to a question probing into any statements about the shooting made by defendant to Lindmark. When asked if he had in fact taken

a homicide statement, Lindmark replied in the affirmative. Immediately thereafter, however, he changed his answer and stated that he did not obtain a homicide statement. Lindmark then testified that he recommended murder charges be filed against the defendant.

Ann Sanders, a correctional matron at the Cook County Jail for 5½ years, testified that she undressed and examined the defendant before admitting her into the facility. Sanders observed approximately 15 bruises on the defendant's body, located on the face, neck, arms, buttocks and breasts. A heavy swelling was noticed on one of defendant's legs.

Glen Richert, a police officer and acquaintance of both Joseph and Ruthe Carbona, testified that he saw Lieutenant Carbona at the Sheriff's Police Station between 3 A.M. and 4 A.M. on December 22, 1971. Richert smelled liquor on the breath of Lieutenant Carbona. It was Richert's opinion that the Lieutenant was under the influence of alcohol. Cross-examination revealed that Richert himself had consumed six drinks earlier in the evening.

Christine Richert, the wife of Glen Richert, testified that she met Lieutenant Carbona with her husband at the Sheriff's Police Station in the early morning hours on December 22, 1971. The Lieutenant and Mrs. Richert proceeded to the Richert home at approximately 4:45 A.M. The deceased consumed about three drinks in waiting for Glen Richert to arrive. At approximately 6 A.M. the Lieutenant departed from the Richert home.

Ruthe Carini, age 11, and Billy Carini, age 10, defendant's children by a previous marriage, testified that they were awakened by loud yelling and screaming at approximately midnight. Voices were soon heard from outside the residence. A car pulled out of the driveway, and screams were heard from the defendant. Both children found defendant lying back into the shrubbery with her feet in the driveway. The children assisted the defendant in returning to the house. After falling back to sleep, the children awoke at 7 A.M. and departed for school at approximately 8 A.M.

Defendant testified in her own behalf. On the evening before the shooting, defendant worked as a waitress for a special Christmas party at Corrado's restaurant. After the party, at approximately 10 P.M., she claimed to have driven one of the patrons, Mr. Bacera, back to his office in Bacera's automobile. She was returned to the restaurant by another patron, Mr. Belpedio, who had followed the two in his car to Bacera's office.

Lieutenant Carbona arrived at the restaurant and saw the defendant speaking with Belpedio at approximately 10:15 P.M. Both defendant and her husband returned home. He told her that she should not speak to

anyone else. Defendant stated that her husband was intoxicated. He slapped her and punched her in the stomach and on her arms. In attempting to escape, defendant ran outside to her automobile. The Lieutenant pulled her from the automobile, threw her into the shrubbery, and backed out of the driveway striking defendant's leg. With the assistance of her children, defendant returned to the house and retired to her bedroom.

She was later awakened by a slap to the face. Joseph Carbona pointed his .38 revolver to her stomach and threatened to shoot her. He then pointed the revolver to her head and again threatened to shoot. The Lieutenant allegedly departed from the house again.

The deceased returned home for a third time at approximately 8:15 A.M. He stated that he was going to leave the defendant and quit his job as a police officer. He began to load his automobile with his personal belongings. Defendant implored him not to leave her. After placing neckties and other items of clothing in his arms, he allegedly grabbed his .357 magnum revolver from a dresser drawer. The deceased was right-handed, and he carried the gun in his right hand. Once at the bedroom doorway, which was on the second floor landing, defendant attempted to block his path. The Lieutenant struck the defendant on her head with his revolver swearing that his mind would not be changed. He then pulled back the hammer, pointed the gun to the defendant's head and again threatened to kill her. The Lieutenant began walking down the stairs when the defendant grabbed and pulled his right arm behind him. The Lieutenant had walked to about the fourth or fifth step down from the second floor landing; he tripped as a result of the struggle, discharging the gun which inflicted the wound in his back.

The defendant testified that she did not let go of the deceased's hand prior to the shooting; that she never had the gun in her hand; and that the Lieutenant was walking and pulling away when the gun discharged. The deceased allegedly held the gun with all four fingers on the side of the cylinder. The hammer was pulled back in a cocked position. The deceased's arm was extended straight behind him.

The defendant enacted her version of the shooting before the jury three times, twice with defense counsel playing the role of the deceased, and once with the assistant State's attorney playing that role. The defendant stood on a chair and pulled the arm of the person playing the role of the deceased, while the latter walked away from her.

On cross-examination the defendant denied ever making a statement to any third party that she only meant to shoot her husband in the shoulder. She also stated that she could not remember being on any

houseboat after the shooting accompanied by a gentleman from Florida who was in the construction business.

In rebuttal, the State recalled Officer Marinelli. He testified that he witnessed the autopsy performed on Lieutenant Carbona's body by Dr. Shalgos.

Officers R. G. Gable, Thomas Vaid, and Errol Levy testified in rebuttal that they had both seen Lieutenant Carbona during the early morning hours of December 22, 1971. They both recalled smelling alcohol on the breath of Officer Richert, but did not detect any alcohol on the breath of Lieutenant Carbona.

Robert Dalziel testified that on July 1, 1972, the defendant was a guest on his houseboat located on Fox Lake. Dalziel allegedly was present during a conversation between the defendant and a gentleman from Florida, Mr. George Dolan. Dolan had asked the defendant how she acquired the name "cop killer" in reference to a previous comment made earlier in the day by a Mr. John Paul Jocovac, a member of the group who had since left the boat. Defendant replied that she had shot her husband. She allegedly told Dolan, "I was glad he was awake and wasn't sleeping when I shot him. I waited until my kids went to school." In surrebuttal, the defendant denied making the statements.

Mrs. Mary Ann Twardzick, the defendant's next door neighbor, testified that on the date of Lieutenant Carbona's funeral, defendant told her that the newspaper lied about the shooting. The defendant allegedly said that she didn't shoot her husband in the back; she shot him in the shoulder. It was later revealed that the defendant was released from jail 1 day after the Lieutenant's funeral. In surrebuttal, defendant denied making the statements.

Margaret Cucletto, the deceased's former wife, testified that never in the 13 years of their marriage had she known Joseph Carbona to be intoxicated. On surrebuttal, defendant stated that the deceased had taken to heavy drinking because of difficulties with his job. She alleged that the deceased was accustomed to drinking a gallon of bourbon a week.

On surrebuttal, George Christepoulas, a toxicologist, testified that the blood, bile and urine of the deceased were tested for their alcoholic content on December 27, 1971. The blood contained an exact amount of 31 milligrams percent alcohol. Cross-examination revealed that this content is equivalent to two beers.

John Paul Jocovac and his wife, Marsha Jocovac, testified that they were with the defendant, Dalziel and Dolan on the houseboat during the afternoon of July 1, 1972. Both had departed the houseboat prior to the time defendant conversed with Dolan and Dalziel about her husband's

death. Both testified, however, that neither the defendant's indictment, nor the shooting incident itself, was ever discussed. Mr. Jocovac denied that he ever mentioned or heard the name "cop killer."

■■ Upon this record the jury could properly find the defendant guilty beyond a reasonable doubt. The autopsy report showed that the entrance wound in the back of the deceased was farther left of the midline than the exit wound in front. The bullet path had a slightly rightward course. On three different occasions, the defendant enacted her version of the shooting before the jury. Defendant claimed that the deceased held the gun with his right hand. In order for the defendant's version to be consistent with the autopsy report, the deceased would have had to position his right hand to the left side of his back, twist towards the right, and fire the gun with his finger (ballistics evidence showed that the revolver could only be discharged by pulling the trigger) to cause the bullet to take a rightward course.

Powder residue was not detected on the deceased's corduroy carcoat. Defendant argued at trial and before this court that any powder traces could have been dislodged from the deceased's fall down the stairs; from lying on his back at the staircase landing; and from contact between the jacket and the transportation basket in which he was removed to the hospital.

The State's evidence indicated that powder residue remained on cotton material (corduroy is a form of cotton) when ammunition from the same manufacturer was fired from the same gun at a distance as great as 48 inches. The deceased's corduroy carcoat was examined microscopically under regular and infrared light. Even if an article of clothing is vacuumed, 100 percent of powder particles cannot be removed.

■■ Three witnesses testified to defendant's out-of-court admissions. Defendant asserts perjury on the part of those witnesses. The record reveals that the credibility of the State's witnesses was sufficiently challenged on cross-examination, during surrebuttal, and during defendant's closing argument. Notwithstanding defendant's assertions, the jury rendered a verdict of guilty. We will not attempt to substitute our judgment regarding credibility of witnesses for the judgment of trier of fact. *People v. Marino*, 44 Ill.2d 562, 256 N.E.2d 770.

A conviction can be sustained upon circumstantial evidence as well as upon direct. (*People v. Hansen*, 5 Ill.2d 535, 126 N.E.2d 243.) The requirement that the defendant's guilt be proven beyond a reasonable doubt does not mean that the jury must disregard the inferences which flow normally from the evidence before it. (*People v. Russell*, 17 Ill.2d 328, 161 N.E.2d 309.) Here all of the inferences from the evidence pointed to the defendant's guilt. The State presented strong evidence

indicating that the deceased could not have been shot at close range. The conclusive nature of the evidence tended to prove that the defendant, from the top landing, shot her husband while he was descending the stairs. The jury was not required to search out potential explanations compatible with innocence, and elevate them to a status of reasonable doubt. (*People v. Benedik*, 56 Ill.2d 306, 307 N.E.2d 382.) Defendant's version of the homicide was contrary to the competent evidence presented. We find that the defendant was proven guilty beyond a reasonable doubt.

Defendant next contends that her statement given to Officer Marinelli at the police station was improperly admitted in violation of *Miranda v. Arizona*, 384 U.S. 436, 16 L.Ed.2d 694, 86 S.Ct. 1602. All of the warnings required by *Miranda* were given to the defendant. She argues, however, that she did not knowingly and intelligently waive her rights before she issued the statement. She further claims on appeal that the statement given to Officer Marinelli at her neighbor's home a short time after the police arrived "tainted" her second statement issued to Marinelli about 2 hours later.

The court conducted a hearing on a motion to suppress prior to trial. Officer Marinelli testified that he asked the defendant whether or not she understood the warnings she had received. The defendant, according to Marinelli's testimony, indicated that she did understand. A voluntary statement, exculpatory in nature, was then issued.

It is the trial judge's function to determine the credibility of witnesses and the totality of circumstances at a hearing on a motion to suppress. The trial court's decision as to the voluntary nature of a defendant's statement will not be set aside unless contrary to the manifest weight of the evidence. (*People v. Pittman*, 55 Ill.2d 39, 302 N.E.2d 7; *People v. Johnson*, 55 Ill.2d 62, 302 N.E.2d 20.) Any clear manifestation of a desire to waive is sufficient. The test is the showing of a knowing intent which is determined not only by the language employed, but also by a combination of that articulation with the surrounding facts and circumstances. (*People v. Higgins*, 50 Ill.2d 221, 278 N.E.2d 68.) Defendant was fully apprised of her rights as required by *Miranda*. She indicated that she understood those rights and volunteered a statement which was exculpatory in nature. There was no evidence of pressure or coercion. The trial court's ruling was clearly not against the manifest weight of the evidence.

Shortly after the police arrived, Officer Marinelli was given a statement by the defendant at her neighbor's home in response to Marinelli's inquiry of "What happened?" At the outset of Marinelli's direct testimony, the court interrupted proceedings in order to conduct a *voir dire* ex-

amination into the nature of the statement. The court excluded the statement from evidence ruling that the defendant should have been given her *Miranda* warnings. This had transpired *before* Marinelli testified in the presence of. the jury that defendant had given him a statement at the police station two hours later. Defense counsel possessed Marinelli's police report which recounted the defendant's first statement. Defense counsel openly admitted no surprise to the statement's existence.

■■ For the first time on appeal, defendant argues that the second statement was the "tainted fruit" of the first statement. The record indicates that the trial judge allowed defense counsel ample opportunity to either renew its motion to suppress after Marinelli's *voir dire* examination or to offer an objection before Marinelli testified about the second statement on grounds that it was tainted by the first statement. The argument was never raised nor considered at trial. We find that the issue was waived. *People v. Nilsson,* 44 Ill.2d 244, 255 N.E.2d 432.

Defendant next contends that certain expert opinion was improperly admitted. The following testimony of Dr. Edward Shalgos, the pathologist who performed the autopsy on deceased's body, is claimed to be an impermissible invasion of the province of the jury:

"PROSECUTOR: Based upon your examination of the entire body of. Joseph Carbona, Doctor, have you formed an opinion based upon a reasonable degree of medical certainty as to whether or not Joseph Carbona's arms could have. been in a position to inflict the wounds that caused his death? \* \* \*

WITNESS: Yes. \* \* \*

PROSECUTOR: What is that opinion? \* \* \* .

WITNESS: It is a physical impossibility for the subject to have shot himself."

Expert testimony is properly admissible when the subject matter is sufficiently beyond common experience so that only persons of skill. or experience are capable of forming a correct judgment as to any. connected fact. (*People v. Fisher,* 340 Ill. 216, 240, 172 N.E. 743.) The prevailing view is that the subject of self-inflicted wounds. is not one of such common experience that laymen may. not be assisted by the opinion of a doctor who has special knowledge regarding anatomy. and injuries to the human body. (*People v. Cole* (1956), 47 Cal.2d 99, 301 P.2d 854; *State v. Campbell* (1965), 146 Mont. 251, 405 P.2d 978; *State. v. Mitchell* (1968), 282 Minn. 113, 163 N.W.2d 310; see also Annot. (1957), 56 A.L.R. 2d 1447; 3 Wharton's *Criminal Evidence,* § 617 (15th ed. 1973);) Medical testimony may be admitted in order to assist the trier of fact even though the expert opinion may coincide with an ultimate issue of fact. "\* \* \* Since the trier of facts is not required to accept the opinion

of the expert, such evidence does not usurp the province of the jury."
*Merchants National Bank v. Elgin, Joliet & Eastern Ry. Co.*, 49 Ill.2d
118, 122, 273 N.E.2d 809; see also *People v. Covey*, 34 Ill.2d 195, 215
N.E.2d 220; *Carlson v. New York Life Insurance Co.*, 76 Ill.App.2d 187,
222 N.E.2d 363; 7 Wigmore, *Evidence* § 1920 (3d ed. 1940).

■■ The jury could have rejected the opinion of Dr. Shalgos in light
of all the other facts and testimony presented. The opinion was simply
one factor for the jury to consider in their attempt to ascertain the truth.
The province and function of the jury was not usurped.

Defendant additionally argues that certain testimony from police of-
ficers was improperly admitted. She claims that the officers were not
shown to possess the requisite expertise to state that Lieutenant Carbona
was dead when they arrived at the Carbona home. The possibility is
raised that the Lieutenant could have been alive and immediate medical
attention might have saved him. Moreover, defendant argues that the
officers should not have been permitted to testify that they could not
smell nor see any traces of gun powder.

Defendant's arguments are without merit. No objections were inter-
posed regarding the officers' opinions that Lieutenant Carbona was dead.
The record reveals three instances on cross-examination where defense
counsel elicited such testimony. Defendant's argument on appeal was
never presented to the trial court and is therefore waived. (*People v.
Trefonas*, 9 Ill.2d 92, 136 N.E.2d 817.) Defendant's theory that police
inaction contributed to the death of Lieutenant Carbona is purely specu-
lative. No evidence was presented at trial to substantiate the argument.

■■ It was proper to admit the officers' testimony concerning the ab-
sence of gun powder. Lay witnesses may testify to physical and natural
facts which are capable of being perceived by the senses. (*People v.
Berkman*, 307 Ill. 492, 139 N.E. 91.) The record indicates that a proper
foundation was laid at trial to establish the officers' familiarity with
powder burns. It was not error to admit the officers' testimony that gun
powder was not detected either by sight or smell.

The fourth issue on appeal is whether the trial court abused its discre-
tion by admitting testimony regarding the State's powder pattern experi-
ments. The defendant argues that bullets from the same manufacturer's
lot as the one recovered from the deceased's carcoat were not used in
the experiments. She also argues that the use of padded cotton instead
of corduroy weave was a significant discrepancy from the actual condi-
tions at the time of the shooting. Testimony regarding the experiments
was presented without objection.

Experiments may be received into evidence if probative of facts in
issue and were conducted under substantially similar conditions and

circumstances as those which surrounded the original transaction or occurrence. (*State v. Atwood* (1959), 250 N.C. 141, 108 S.E.2d 219; *People v. Willson*, 401 Ill. 68, 81 N.E.2d 485; see also Annot. (1962), 86 A.L.R.2d 611.) The admissibility of experimental evidence is a matter within the discretion of the trial court. A reversal is not warranted unless the clear abuse of discretion is demonstrated. *Hardman v. Helene Curtis Industries, Inc.*, 48 Ill.App.2d 42, 198 N.E.2d 681.

Although defense counsel argued in closing argument that ammunition from different manufacturer's lots would produce different results, no competent evidence was presented to support such an argument. Moreover, no competent evidence was produced at trial that powder residue would form differently, or not form at all, on corduroy weave than residue formation on padded cotton. The testimony indicates that corduroy is a form of cotton.

Admitting testimony about the experiments was not an abuse of discretion. Requiring that all the conditions of an experiment be perfectly identical to actual conditions would largely preclude experimental evidence as a practical method of proof. The same elements of the Carbona shooting were employed in the State's experiments; the same .357 magnum revolver, the same kind of ammunition from the same manufacturer, the same kind of target material (padded cotton), and the same proximate distances inherent to defendant's version of the incident. Evidence indicated that fast-burning powder will also leave a residue. The oral testimony regarding the powder residue merely described what kind of powder residue remains at certain firing distances. The experimenters' weight and probative value was to be determined by the jury.

Defendant next contends that it was prejudicial to allow the use of an incomplete diagram depicting the floor plan of the foyer area and staircase of the Carbona home. Defendant argues that essential portions of the scene were omitted from the diagram—*i.e.*, metal staircase rail, grille, location of body, and the presence of an alleged bloodstain on the wall. ■■ Contrary to defendant's argument, the diagram is not incomplete. With the aid of witness testimony before the jury, defense counsel was able to insert subsequent markings on the diagram depicting the four items allegedly missing. The record reveals that counsel for both sides used the diagram in their presentation. The diagram appeared complete in every detail. Furthermore, two photographs of the stairway and the foyer area were admitted into evidence and examined by the jury. The jury had a complete view of the scene. There is no indication that they were misled. The trial court, therefore, did not commit error by permitting the diagram's use for demonstrative purposes. *People v. Howze*, 7 Ill.App.3d 60, 286 N.E.2d 507.

Defendant's sixth issue is that the State's rebuttal evidence is improper because it should have been introduced in the State's case in chief; it doesn't rebut anything adduced by defendant; and it should have been excluded due to the State's failure to disclose defendant's admissions pursuant to Supreme Court Rule 412. Ill. Rev. Stat. 1973, ch. 110A, par. 412.

Rebutting evidence is that which explains, repels, contradicts, or disproves the evidence given by defendant. (*People v. Bell,* 328 Ill.446, 159 N.E. 807; see also 2 Wharton's *Criminal Evidence,* § 466 (13th ed. (1972).) "Although testimony that would be proper as evidence in chief should not be reserved for rebuttal, these matters rest largely within the discretion of the trial court and such rulings will ordinarily not be set aside upon review." (*People v. Lion,* 10 Ill.2d 208, 217, 139 N.E.2d 757.) The fact that testimony might also be competent in chief does not render it improper for rebuttal. *People v. Crump,* 5 Ill.2d 251, 125 N.E.2d 615.

██ Admissions or subsequent conduct may be allowed in evidence to prove the accused's intent or guilty knowledge. (*People v. Storer,* 329 Ill. 536, 161 N.E. 76.) The rebuttal testimony of Mrs. Twardzick and Mr. Dalziel concerned admissions allegedly made by defendant subsequent to her husband's death. The record clearly indicates that those alleged admissions were introduced to contradict defendant's testimony. We see no abuse in the trial court's decision to allow such evidence in rebuttal. The defendant refuted the State's witnesses in surrebuttal and in closing argument. Questions of credibility remained for the jury to decide.

Defendant further argues that her alleged admissions should have been revealed to her prior to trial pursuant to Supreme Court Rule 412, which requires the State to turn over all information in its possession relating to a defendant's statements to third parties. The record indicates that the State did not acquire possession of those statements until two weeks prior to trial. Defense counsel interviewed both witnesses before they testified in rebuttal. Moreover, Supreme Court Rule 415 (Ill. Rev. Stat. 1973, ch. 110A, par. 415) provides a number of sanctions which the trial court may apply at its discretion under any given set of circumstances. Failure to comply with the discovery requirements of Rule 412 does not mandate the exclusion of the proffered evidence. Under the circumstances, we agree with the trial court that defendant was not placed at an unfair disadvantage of surprise.

██ Mrs. Cucletto testified that never in 13 years of marriage did she know Joseph Carbona, her former husband, to be intoxicated. We believe that this testimony was improper. Mrs. Cucletto had not lived with the deceased for approximately 6 years before his death. Her knowledge

of the deceased's drinking habits was immaterial to the question of whether or not Joseph Carbona had been drinking on the evening before his death. However, Mrs. Cucletto's testimony is entitled to no weight since the coroner's toxicologist mitigated her testimony by finding alcohol in the blood of the deceased. Allowing Mrs. Cucletto's testimony into evidence was harmless error. *People v. Gill,* 54 Ill.2d 357, 297 N.E.2d 135.

Defendant next contends that she was entitled to a motion for acquittal after the close of the State's case in chief. Specifically, she claims that competent evidence did not establish that the body examined by Dr. Shalgos was, in fact, the body of the deceased. She further argues that the rebuttal testimony of Officer Marinelli that he personally witnessed the autopsy was essential to proving the death of Joseph Carbona and was improper rebuttal.

■■ The elements to be proved in cases of criminal homicide are proof of death and proof of criminal agency causing death. (*People v. Benson,* 19 Ill.2d 50, 166 N.E.2d 80.) Proof of death and identity of the deceased may be established by circumstantial evidence. (*People v. Gendron,* 41 Ill.2d 351, 243 N.E.2d 208; *People v. Schneider,* 360 Ill. 43, 195 N.E. 430.) In the instant case, Officers Shaw and Denaer accompanied the body of the deceased when it was removed from the Carbona home to the hospital morgue. After Lieutenant Carbona was pronounced dead, the two officers undressed the body, noting the types of wounds received by the deceased. The body was tagged for identification by Shaw. Dr. Shalgos testified that he knew the body was Lieutenant Carbona's because of the identification tags. Moreover, photographs taken of the deceased at the morgue were introduced into evidence. The wounds shown by the photographs corresponded not only to the wounds described in the autopsy report of Dr. Shalgos, but also to the wound descriptions given by other witnesses. Even without Officer Marinelli's rebuttal testimony, we believe that the evidence adequately established the identity of the deceased, Joseph Carbona.

The defendant next contends that it was error to allow James Lindmark, a former assistant State's attorney, to testify to his recommendation that murder charges be lodged against her. Defendant relies on the case of *People v. Blissitt,* 12 Ill.App.3d 551, 299 N.E.2d 562, which holds that it is prejudicial error for the State to offer a prosecutor's testimony regarding his recommendation that murder charges be placed against a defendant.

■■ We find *Blissitt* inapplicable to the facts at bar. In *Blissitt,* the investigating prosecutor was called as a witness by the State; in the instant case, he was initially called by the defendant. Lindmark testified to his observations and his conversations with the defendant on the day he

was assigned to investigate the incident. The testimony elicited had the effect of exhibiting a sympathetic disposition toward the defendant on the part of the investigating prosecutor. It is quite possible, as the State argues, that the jury could have surmised that Lindmark believed in the defendant's innocence or that the State's attorney's office was not of one mind in the prosecution of the defendant. It was permissible, therefore, to allow the State to further inquire into Lindmark's observations and conduct. A defendant cannot complain about lines of inquiry which he or she initiated. (*People v. Bridgeforth,* 51 Ill.2d 52, 281 N.E.2d 617; *People v. Wesley,* 18 Ill.2d 138, 163 N.E.2d 500.) Moreover, the State was entitled to dispel the impression that defendant was believed to be innocent by the investigating prosecutor. One of the classic functions of cross-examination is to weaken or explain previous testimony or impressions given by a witness on direct. (*People v. Garcia,* 3 Ill.App.3d 695, 279 N.E.2d 506 (abstract opinion).) The defendant cannot hope to create an erroneous impression or a half-story without opening the door to a fuller explanation by the State on cross-examination. It was not prejudicial error to allow the State to inquire into the recommendation made by Lindmark immediately following his initial investigation. The inquiry served one of the legitimate purposes of cross-examination.

The cross-examination of Lindmark shows the following:

"DEFENSE COUNSEL: Did you have an occasion to make any recommendations to those police officers as to the charges in this particular case?

MR. LINDMARK: I did.

DEFENSE COUNSEL: Object to that, if the Court please.

THE COURT: I will overrule it.

DEFENSE COUNSEL: *It's way out of the direct.*

PROSECUTOR: What were the charges that you recommended?

MR. LINDMARK: Murder.

PROSECUTOR: I have nothing further.

THE COURT: Re-direct.

DEFENSE COUNSEL: Judge, there is a motion for a mistrial here." (Emphasis added.)

The trial court then correctly pointed out that no objection had been made to the question concerning the charges which were recommended. Moreover, no objection was made to the first question, "Did you have any occasion to make any recommendations to those police officers as to the charges in this particular case?" until the question had been answered. When the objection was made, no reason was given for it; and after the court overruled it, the defense attorney advanced as ground for the objection that it was "way out of the direct." The defendant's one

objection was not timely, nor was the ground advanced proper. *People v. Trefonas,* 9 Ill.2d 92, 136 N.E.2d 817.

Further, any appreciable prejudicial effect was mitigated by protective measure taken by the court. The jury was instructed that a murder charge was not any evidence against the defendant and did not create an inference of guilt. Additionally, the trial court ruled that Lindmark's recommendation could not be made the subject of closing argument.

As a ninth issue defendant asserts that it was prejudicial error to allow Lindmark to inform the jury on cross-examination that defendant was unwilling to give a homicide statement in the exercise of her right to remain silent. Defendant points to the following colloquy:

> "PROSECUTOR: And did you, in fact, take a homicide statement from the defendant, Ruthe Carbona?
>
> MR. LINDMARK: I did.
>
> DEFENSE COUNSEL: Objection, if the court please.
>
> THE COURT: Sustained.
>
> PROSECUTOR: Mr. Lindmark—
>
> THE COURT: Just a minute. I will overrule. Let him answer yes or no.
>
> PROSECUTOR: Did you, in fact, take a homicide statement from the defendant, Mrs. Ruthe Carbona?
>
> MR. LINDMARK: No."

The record discloses that the jury was informed that the defendant gave a lengthy explanation of her version of the shooting to Officer Marinelli. The jury also heard Lindmark testify on direct that he had a conversation with the defendant during a 2- to 4-hour period. Defendant did not remain silent. It cannot be claimed that the jury was left with the impression that the defendant had maintained silence in order to hide her guilt. Therefore, defendant's fifth amendment right to be free from self-incrimination is not in issue. *People v. Queen,* 56 Ill.2d 560, 310 N.E.2d 166; *People v. Kent,* 15 Ill.App.3d 523, 305 N.E.2d 42.

On direct examination of Mr. Lindmark, the defense attorney asked if Lindmark, when he observed the defendant in her condition, had a further conversation with her, to which the witness said "Yes." The defense attorney then asked, "What was the gist of that conversation?" The witness answered: "It is hard for me to recall what was the conversation with her and what was with her mother. They were together." The defense attorney then asked: "All right could you tell us what the conversation was with her and her mother?" The witness said: "Yes. Her mother indicated that she had an attorney. *I had been sent there to take a homicide statement.* I called you [defense attorney] and inquired whether you wanted to come out to that station while I took the

statement. I believe you spoke to the mother. Subsequent to that I had another conversation with her in one of the side offices and at that time was the time that the policewoman, she, her mother, *and myself were present.*" (Emphasis added.) Defense counsel further inquired, "What was the gist of that conversation?" Lindmark answered, "I inquired of her where she received what I considered to be bruises, etc."

In cross-examination the prosecutor had the right to inquire of the witness whether or not he had any records from which he had refreshed his recollection. His first question of Lindmark was whether or not Lindmark had made a summary or a report of what transpired on that particular day. It is of the utmost importance to note that the defense attorney elicited the fact that Lindmark had been "sent there to take a homicide statement." The jury had no homicide statement before it. Under the circumstances, the jury could well wonder what had happened to it and whether or not it was exculpatory. Under that state of the record, the State had the right to show that it did not have any homicide statement and that Lindmark did not take one. The record also reflects that in the conversation between Lindmark and the defense attorney, the defense attorney told Lindmark that there was to be no questioning of the defendant unless the defense attorney was present. That conversation was never presented to the jury. It would be manifestly unfair, therefore, to preclude the State from at least showing that Lindmark did not in fact take a statement.

Moreover, we do not find any appreciable prejudicial effect stemming from Lindmark's testimony. Prior to the colloquy in question, the trial court, in an attempt to protect the defendant's right to remain silent, admonished Lindmark not to testify that defense counsel had advised defendant to refrain from volunteering information without his presence. Lindmark's statement itself, moreover, is self-contradictory and therefore nonprobative. Furthermore, the State did not comment in closing argument, or elsewhere, on defendant's failure to give a homicide statement. The lack of prosecutorial comment strongly mitigates any harm that could have arisen from Lindmark's testimony. *United States ex rel. Moore v. Woods* (7th Cir. 1970), 420 F.2d 1260.

The tenth issue raised for our consideration is the prejudicial nature of various comments contained in the State's closing arguments and in the questions put to defendant during cross-examination. Defendant contends that evidence was misstated in the following comments: that the defendant grabbed the deceased's gun and hand to prevent him from leaving; that the defendant shot her husband from the top of the stairs as he was near the bottom landing because she saw "her life of luxury" leaving with his departure; and that two of the four bullets found in the

.357 magnum revolver were .38-caliber. Defendant also argues that the prosecutor's comment on the "unrebutted" nature of the State's ballistics evidence improperly diluted defendant's presumption of innocence. Finally, defendant argues that the prosecutor stated his personal opinion in closing argument.

A prosecuting attorney has the right to draw legitimate inferences from facts and circumstances proved. Such arguments and statements of counsel are within the scope of proper debate. It is not improper for the prosecuting attorney to comment unfavorably on the defendant, or to place her in a bad light, if the State's argument is based on competent and pertinent evidence. (*People v. Miller*, 13 Ill.2d 84, 148 N.E.2d 455; *People v. Heidman*, 11 Ill.2d 501, 144 N.E.2d 580.) Moreover, it has been held that the prosecutor may comment on the defendant's failure to contradict the State's expert testimony. Such commentary does not shift the burden of proof to the defendant thereby diluting her presumption of innocence. The State may properly emphasize the absence of pertinent evidence. *People v. Peter*, 55 Ill.2d 443, 303 N.E.2d 398; *People v. Mills*, 40 Ill.2d 4, 237 N.E.2d 697.

■■ Applying these principles to the record before us, we cannot find that the State's closing remarks transcended the bounds of legitimate debate. It was entirely proper to comment upon and to theorize from the ballistics evidence presented. (*People v. Walker*, 22 Ill.App.3d 711, 318 N.E.2d 111.) Even though the term "life of luxury" as used by the prosecuting attorney was not expressed with the nicety of a polite conversation, it was reasonable to infer a spiteful motive on the part of the defendant from the facts presented in evidence. *People v. Shack*, 396 Ill. 285, 71 N.E.2d 633.

■■ The prosecuting attorney's remarks attesting to the honesty of the State's witnesses appear to be an expression of personal belief, which normally would be considered improper. However, the record discloses that defendant's summation vigorously attacked the credibility of the State's witnesses and strongly implied that perjury was instigated by the State's effort to convict the defendant. An advocate is permitted considerable reply to his opponent's arguments even in responding to matters of credibility. (*United States v. Nowak* (7th Cir. 1971), 448 F.2d 134.) The prosecutor's remarks constituted a legitimate reply to the defendant's accusations that the police officers and other witnesses offered by the State were guilty of perjury. Defendant, having provoked this reply, cannot now complain. *People v. Hayes*, 23 Ill.2d 527, 179 N.E.2d 660.

Defendant further contends that during her cross-examination, the prosecuting attorney attempted to portray her as a "bad woman" who provoked the deceased to any mistreatment of her because of her pro-

miscuous behavior. The record does not disclose any other explicit statements by the prosecuting attorney evidencing the alleged insinuations except the following exchange:

"PROSECUTOR: Well, Mrs. Carbona, isn't it a fact that you shot your husband with a .357 magnum as he was leaving your house?

DEFENDANT: No, I never did.

PROSECUTOR: Because he had caught you with Mr. Belpedio in that parking lot and you saw your meal ticket walking down the stairs?"

The evidence indicates that on the evening prior to the shooting the deceased met his wife conversing with Mr. Belpedio in the parking lot of the restaurant where she was employed. Defendant's own testimony reveals that the situation contributed to the violent domestic quarrel which culminated in the Lieutenant's death.

■■ The extent of appropriate subjects of inquiry for cross-examination is determined by the sound discretion of the trial court. It is only in the case of clear abuse of such discretion resulting in manifest prejudice to the defendant that a court of review will interfere. (*People v. Burris*, 49 Ill.2d 98, 273 N.E.2d 605.) The defendant, by taking the stand, subjected herself to legitimate cross-examination on matters which were elicited on direct. Any prejudice which might have resulted due to improper insinuations was clearly not material to the determination of guilt. We have carefully scrutinized the defendant's cross-examination and conclude that there was no abuse of judicial discretion and that any prejudicial effect was insubstantial. Allegedly reprehensible trial conduct will not result in reversal if the prejudicial impact is not material to the outcome. However, our supreme court has concluded that disciplinary action against offending counsel may be the only effective deterrent. *People v. Butler*, 58 Ill.2d 45, 317 N.E.2d 35.

Defendant next contends that the jury was improperly interrogated about publicity concerning the trial. Specifically, defendant points to the trial court's method of questioning the jury collectively as to whether any of them had discussed the case among themselves or read news media publicity about the case. This form of collective questioning, defendant argues, precluded any juror from admitting exposure to extrajudicial publicity.

■■ Defendant's claim has no merit. The mode of interrogating jurors regarding publicity rests with the sound discretion of the court. (*People v. Heller*, 131 Ill.App.2d 799, 267 N.E.2d 685.) At the first instance of being notified of media coverage, the trial court offered to make any inquiry requested by defense counsel. Only a general inquiry was sug-

gested. The record discloses 14 different occasions in which defense counsel requested and approved a general inquiry of the jury. At one point, the trial judge questioned each juror separately in chambers at the request of defense counsel. Defendant cannot invite the court to adopt a certain procedure and then urge on appeal that the judge's action was error. (*People v. Rossi*, 52 Ill.2d 13, 284 N.E.2d 275.) Not only do we find the method of inquiry invited, but we also believe that it was a fair use of judicial discretion.

Defendant's final complaint is that the jury was improperly instructed in several ways. First, it is argued that the court erred in giving IPI-Criminal 3.02, which defines circumstantial evidence, without adding the second paragraph of that instruction. The language rejected by the court reads as follows:

"You should not find defendant guilty unless the facts and circumstances proven exclude every reasonable theory of innocence."

The committee note appearing after this instruction states that the above language should be given only when the proof of guilt is *entirely* circumstantial. The State in the instant case introduced three witnesses who testified to admissions allegedly made by the defendant. The testimony of those witnesses can clearly be considered direct evidence. The above language was properly excluded from the circumstanial instruction. *People v. Brooks*, 7 Ill.App.3d 767, 289 N.E.2d 207; *People v. Christiansen*, 118 Ill.App.2d 51, 254 N.E.2d 156.

The second argument raised by defendant is that the giving of IPI-Criminal 3.06 instructing the jury on the consideration which should be accorded to defendant's alleged admissions was prejudicial. Defendant suggests that the term "statement" should have been utilized by the court rather than the word "admission."

An admission is a statement of independent facts from which guilt may or may not be inferred. An admission is not a confession, the latter being a voluntary acknowledgment of guilt comprehensively encompassing all the elements of the crime. (*People v. Koch*, 15 Ill.App.3d 386, 304 N.E.2d 482.) IPI-Criminal 3.06 is a simple, unbiased instruction designed to inform the jury that the weight of an alleged admission should be determined from all the circumstances under which it was made. The instruction was not prejudicial to the defendant.

Finally, defendant contends that the court denied her the right to have the jury instructed on her theory of the case. Specifically, defendant claims it was error for the court to refuse to instruct the jury that the State had to prove that the shooting of Joseph Carbona was not an accident. Instead, the court gave IPI-Criminal 7.02 which states that a person who kills another without lawful justification commits murder if

in performing the acts which caused death (1) she knows that such acts create a strong probability of death or great bodily harm, or (2) she either intends to kill or do great bodily harm, or knows that such acts will cause death. The jury was also instructed that excusable homicide by misadventure or accident "is when a person is doing a lawful act without intention of killing, yet unfortunately kills another." The jury was further instructed that excusable homicide was a question of fact which they must decide.

■■ Supreme Court Rule 451 (Ill. Rev. Stat. 1971, ch. 110A, par. 451) provides that whenever an Illinois Pattern Instruction in Criminal Cases is applicable it shall be used by the court unless the instruction does not accurately state the law. The jury in the instant case was properly instructed as to the State's burden in proving the elements and issues of the crime of murder. The jury was also instructed as to the mental state required before the defendant could be found guilty. Additionally, the court defined death by accident or misadventure for the jury. Since all of the appropriate instructions from the Illinois Pattern Instructions for Criminal Cases were given, we see no need to instruct the jury that the State must prove that death did not occur by accident or misadventure. *People v. Witherspoon,* 55 Ill.2d 18, 302 N.E.2d 3; *People v. Puckett,* 6 Ill.App.3d 206, 285 N.E.2d 258.

For these reasons, judgment is affirmed.

Judgment affirmed.

GOLDBERG and EGAN, JJ., concur.